### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE:   NICHOLAS BAYER, | : | |
| | : | **Chapter 7** |
| Debtor. | : | |
| | : | **Bky. No.  12-11083 ELF** |
| _____ | : | |
| | : | |
| JOHN LARSON and | : | |
| GREG BAYER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | **Adv. No. 12-0379 ELF** |
| NICHOLAS BAYER, | : | |
| | : | |
| Defendant. | : | |
| | : | |

# O P I N I O N

# I.  INTRODUCTION

The dispute giving rise to this adversary proceeding stems from the sale of the assets of a start-up business, Saxby's Coffee, Inc. ("SCI"), to owners who subsequently operated the enterprise through a new entity, Saxby's Coffee Worldwide, LLC ("SCW").  The ill-fated transaction gave rise to much litigation[1] and several bankruptcy filings.[2]

The debtor in the above-captioned bankruptcy case, Nicholas Bayer ("N. Bayer"), was

---

[1]      Some of the history and litigation previously was described in two (2) reported decisions, In re Saxby's Coffee Worldwide, LLC, 440 B.R. 369 (Bankr. E.D. Pa. 2009) and  In re Saxby's Coffee Worldwide, LLC, 436 B.R. 331 (Bankr. E.D. Pa. 2010).

[2]      All of the principals of SCW filed personal bankruptcy cases in this bankruptcy district. (See Bky. Nos. 12-11063, 12-11083, 12-14408).

the officer/director (and shareholder) of SCI and the driving force behind the SCI-SCW

transaction. He later became an officer of SCW.  Plaintiffs John Larson ("Larson") and Greg

Bayer ("G. Bayer") (Larson and G. Bayer collectively, "the Plaintiffs"), shareholders of SCI,

claim that N. Bayer was motivated by a promised employment contract with SCW and that he

breached his state law based fiduciary duty to SCI because the SCI-SCW transaction stripped

SCI of all of its assets without any recompense to SCI (and its shareholders). In their capacity as

shareholders of SCI, the Plaintiffs claim that SCI holds a nondischargeable claim against N.

Bayer, primarily under §523(a)(4), which excepts from a debtor's discharge any debt "for fraud

or defalcation while acting in a fiduciary capacity."

On the record presented, I find that N. Bayer was not a "fiduciary" to SCI (and indirectly,

to its shareholders, including Larson and G. Bayer) as that term is used in 11 U.S.C. §523(a)(4).

Therefore, the Plaintiffs' §523(a)(4) claim must fail.  Further, as elaborated below, the Plaintiffs'

remaining claims (under §523(a)(2) and, possibly, §523(a)(6)) were waived or have no merit.

Consequently, the Plaintiffs are not entitled to a determination of nondischargeability and

judgment will be entered in N. Bayer's favor on all claims.

## II.  PROCEDURAL HISTORY

### A.  Adv. No. 12-0379

On February 6, 2012,  N. Bayer filed a voluntary chapter 7 petition.  The chapter 7

Trustee determined that this was a no-asset case.  On May 10, 2012, the Plaintiffs timely filed

this adversary proceeding against N. Bayer, seeking a determination that the claims they asserted

in a pre-petition Illinois state court action are nondischargeable.[3]   In their Amended Complaint,

the Plaintiffs asserted that the claims are nondischargeable under 11 U.S.C. §§523(a)(2) and

523(a)(4).  (Doc. #15).[4]

### B.  Adv. No. 12-0378

The Plaintiffs filed a similar adversary action against another debtor, Joseph Grasso

("Grasso") arising from the same operative facts.  See Adv. No. 12-0378.  Grasso's main

bankruptcy case is on the docket of my colleague, Hon. Magdeline D. Coleman.  Grasso was one

of the principals of SCW, the purchasing entity in the SCI-SCW transaction.  Due to the

common issues of fact with respect to Larson's and G. Bayer's claims against N. Bayer and their

claims against Grasso, Judge Coleman assigned Adv. No. 12-0378 to my docket, where I

---

[3]        N. Bayer was granted a bankruptcy discharge on November 28, 2012.  Of course, the
discharge is subject to a determination in this adversary proceeding that the claims of Larson and G.
Bayer are excepted from the discharge.  See 11 U.S.C. §523(a).

[4]        The Amended Complaint also purported to incorporate by reference three (3) counts of
the second amended complaint that was filed in the Chancery Division in the Circuit Court of Cook
County, Illinois ("the Illinois State Court").  The three (3) counts included:

> Count III – John Larson claims N. Bayer fraudulently induced him to enter into
> the Separation Agreement with SCI, while SCI and N. Bayer had no intention to
> perform under the Agreement;
>
> Count IV – G. Bayer, derivatively on behalf of SCI against N. Bayer for breach
> of fiduciary duties to the shareholders of SCI;
>
> Count IV – John Larson and G. Bayer claim that N. Bayer was involved in a civil
> conspiracy to commit fraud.

The Amended Complaint did not tie these state law claims to any particular
nondischargeability provision of the Bankruptcy Code.  This is discussed further in n.18, infra.

consolidated the two (2) adversary proceedings for trial.[5]

### C.  The Consolidated Trial

On January 11, 2013, the parties filed their Joint Pretrial Statement.  (Adv. No. 12-0379, Doc. #22; Adv. No. 12-0378, Doc. # 18).  With respect to N. Bayer, the Joint Pretrial Statement states, in Part IV: "Plaintiff merely seeks a determination as to whether the pending Illinois State Court Claim should be held nondischargeable under 11 U.S.C. § 523(a)(2) and/or § 523(a)(4)." (Adv. No. 12-0379, Doc. # 22).

I held a trial of the consolidated adversary proceedings on December 12 and 13, 2013. (Docket Entry No. 50).

One particular aspect of the trial requires mention.  After the conclusion of the Plaintiffs' case-in-chief, the Defendants moved for a directed verdict.  A lengthy colloquy ensued, during which I expressed the view that a claim under 11 U.S.C. §523(a)(6) may have been tried by consent, see Fed. R. Civ. P. 15(b)(2).  (2 N.T. at 20-21, 31-34, 54-58).[6]  While the discussion is not entirely clear on this point, my comments could be read broadly to refer to the Plaintiffs' claims against both N. Bayer and Grasso.

---

[5]       At this time, I am issuing my decision in the N. Bayer adversary proceeding only. Currently pending before Judge Coleman are multiple objections to Grasso's chapter 7 discharge under 11 U.S.C. §727(a).  (See Adv. Nos. 13-0477, 13-0479 and 13-0481).  A denial of Grasso's discharge would moot the Plaintiffs' nondischargeability claims.  Therefore, I am deferring a ruling in the Grasso adversary proceeding, Adv. No. 12-0378, until after the §727(a) objections to Grasso's discharge are decided.

[6]       I will refer to the notes of testimony from December 12, 2013 as "1 N.T." and from December 13, 2013 as "2 N.T."

After the conclusion of the trial, the parties filed post-trial briefs, the last of which was

filed May 15, 2014.  (Doc. #'s 70, 71).[7]

## III.  FINDINGS OF FACT

1.  In 2003, Plaintiffs Larson and G. Bayer started a chain of coffee shops through a

corporation called Proven Record, Inc.[8] and operated under the name "Saxby's Coffee."

(Joint Pretrial Statement ¶ II, 1.).

2.  In August 2005, the Plaintiffs caused Proven Record to enter into a transaction with SCI, a

Georgia corporation, pursuant to which Proven Record transferred all of its assets to SCI.

(Id. ¶ II, 2.; 1 N.T. at 156, 235).[9]

3.  SCI was a coffeehouse franchisor, primarily marketing, selling and administering franchise

agreements for the operation of retail coffee shops.  (1 N.T. at 13-14, 157-58).

4.  N. Bayer began working for SCI in August 2005 and also became a shareholder of the

---

[7]    The court's briefing order contemplated the filing of proposed findings of fact, conclusions of law and a supporting memorandum.  (See Doc. #'s 60, 68).  Neither side followed that format, filing only narrative briefs in support of their positions.  The Plaintiffs filed an eleven (11) page brief, only seven (7) pages of which were devoted to Larson's and G. Bayer's claims against N. Bayer (the balance discussing their claims against Grasso).  (See Doc. #70).  N. Bayer filed a thirteen (13) page brief in response.  (Doc. #71).

[8]    Proven Record, Inc. also had other investor-shareholders.  (1 N.T. at 217-18).

[9]    In the Proven Record-SCI transaction, all of the Proven Record assets were transferred to SCI.  (1 N.T. at 224-27).  I infer from the description of the transaction provided at trial that there was no monetary recompense to the shareholders of SCI.  Thus, the later SCI-SCW transaction (which the Plaintiffs challenge as fraudulent) closely resembled the 2003 Proven Record-SCI transaction that the Plaintiffs engineered.  Both asset sale transactions left some or all of the shareholders of the selling company with worthless stock. There is a certain irony in this.

corporation.  (Jt. Pt. Stmt. ¶ II, 3.).

5.    In mid-to-late 2006, John Larson resigned as the President and director of SCI.  (Id. ¶ II, 4;

1 N.T. at 161).

6.    G. Bayer also transitioned out of SCI around the same time as Larson, in mid-to-late 2006.

(1 N.T. at 161).

7.    In September 2006, N. Bayer became the President and sole director of SCI.  (Id. at 11).

8.    At that time, John Larson owned six (6) million shares of SCI (representing 24% of the

shares), G. Bayer owned five (5) million shares (20%), and N. Bayer owned six (6) million

shares (24%).  (Ex. P-1; 1 N.T. at 12).

9.    On September 13, 2006, Larson entered into an agreement with SCI ("the Separation

Agreement"), which provided, inter alia:

> a.  that SCI would engage Larson as a consultant and remit biweekly payments of
>     approximately $5,200.00;
>
> b.  SCI would have the option to purchase Larson's shares for a period of time
>     and subsequently would have the right of first refusal in the event that Larson
>     chose to dispose of his shares;
>
> c.  N. Bayer was granted an irrevocable proxy to vote Larson's 6 million shares
>     of SCI.

(Ex. P-1; Jt. Pt. Stmt. ¶ II, 5.).

10.   SCI made several of the biweekly payments required by the Separation Agreement, but

defaulted on its payment obligation in late 2006. (1 N.T. at 123-124, 206-207).

11.   Between September 2006 and June 2007, several shareholders were issued new or

additional shares in SCI:

| Shareholder | Number of Shares in 9/2006 | Number of Shares in 6/2007 |
|---|---|---|
| Lin Bayer | 17,500 | 500,000 |
| David Lee | 17,750 | 1,000,000 |
| Dave Bayer | 0 | 500,000 |
| Shane Reinhart | 0 | 500,000 |

(2 N.T. at 113-114; Ex. P-1).[10]

12.   Thereafter, SCI entered into negotiations with Joseph Grasso ("Grasso") and Kevin

Meakim ("Meakim") to invest in SCI.  (1 N.T. at 22).

13.   N. Bayer originally attempted to negotiate a deal in which Grasso and Meakim would both

infuse capital into SCI as well as buy out the shares of the Plaintiffs.  (1 N.T. 83, 106).[11]

14.   Over time, the structure of Grasso and Meakim's potential investment in SCI transitioned

from an equity investment and stock purchase transaction to an asset purchase transaction.

(See Ex. P-11).

15.   On June 4, 2007, SCI sent a notice to its shareholders informing them of a special

shareholder meeting scheduled for June 14, 2007 to vote on the sale of SCI's assets to

---

[10]      Once he had Larson's proxy, N. Bayer effectively controlled 48% of the voting stock.
According to the Plaintiffs, N. Bayer issued these additional shares, which represent roughly 10% of the
voting shares, to close friends and family members as part of a strategy designed to "dilute" the Plaintiffs'
voting position and ensure that N. Bayer  had voting control.  It is not clear why N. Bayer needed to dilute
the Plaintiffs' voting position after Larson effectively gave N. Bayer voting control of SCI in September
2006 through the irrevocable proxy. In any event, N. Bayer disputes that he issued these shares and
claims that Larson issued some of them.  (1 N.T. at 89-91).  To decide this adversary proceeding, it is not
necessary to make a factual finding on this disputed issue of fact.

[11]      At one point in the negotiations, Grasso and Meakim offered $400,000.00 to Larson and
$300,000.00 to G. Bayer for their shares, but that offer was later reduced to $100,000.00.  (1 N.T. at 242).

Grasso and Meakim.  (Ex. P-4; 1 N.T. at 180).[12]

16.  On June 11, 2007, Larson informed N. Bayer that he was revoking his voting proxy in light

of SCI's missed payments and other alleged breaches of the Separation Agreement.  (See

Ex. P-5, P-6).

17.  At the June 14, 2007 shareholder meeting, G. Bayer asserted that he owned Larson's six (6)

million shares of SCI.  (1 N.T. at 180, 221).[13]

18.  At the shareholder meeting, N. Bayer invoked the Larson voting proxy and voted to

approve an asset sale to Grasso and Meakim and the sale was approved.  (1 N.T. at 126; Jt.

Pt. Stmt. ¶ II, 7.).

19.  The ultimate reason for N. Bayer's support of the asset sale to Grasso and Meakim was

SCI's cash poor position, its inability to pay its debts as they fell due (including its own

payroll) and the substantial delinquencies it owed to many creditors, including Larson and

the Internal Revenue Service for trust fund taxes.  (1 N.T. at 171-72, 175-76).[14]

20.  On July 20, 2007, SCI executed a written Asset Purchase Agreement with Saxby's Coffee

---

[12]    Other than stating that a vote on the asset sale would take place, the notice did not
describe the terms of the sale or attach the proposed asset sale agreement.  The Plaintiffs consider the
absence of a description of the proposed transaction indicative of N. Bayer's misconduct.  Again, it is not
necessary to make a factual finding on this issue of fact.

[13]    G. Bayer claimed that he purchased Larson's shares prior to the June 14, 2007
shareholder meeting.  (See 1 N.T. at 221).

[14]    Larson disputes this fact.  He denied that SCI was in a cash flow crunch in late 2006 and
early 2007 based on his belief that the company had ample cash when he was involved in its management.
However, after September 2006, he was no longer involved in the management of the company.  I do not
credit his testimony as it lacked foundation.  Rather, I credit N. Bayer's testimony on this point, which is
supported in the Statement of Revenues and Expenses set forth as part of Ex. P-33.

Worldwide, LLC ("SCW"), a new entity formed and owned by Grasso and Meakim.  (Ex. P-11).

21.    After the sale of assets to SCW, N. Bayer became the President and CEO of SCW.  (1 N.T. at 42).

22.    In 2007, the Plaintiffs sued <u>inter alia</u>, N. Bayer and Grasso in Illinois State Court raising, <u>inter alia</u>, the claims described in note 4, <u>supra</u>.


# IV.  LEGAL STANDARDS - GENERALLY

## A.  Dischargeability - 11 U.S.C. §523(a)

The Bankruptcy Code seeks to promote two core policies:  providing debtors with a fresh start and maximizing the equitable distribution of property to creditors.  <u>See, e.g.</u>, <u>In re WR Grace & Co.</u>, 729 F.3d 332, 346 (3d Cir. 2013).  However, the fresh start policy has certain limitations; not all debts are dischargeable.  Based on various competing policy concerns, <u>see, e.g.</u>, <u>In re Janc</u>, 251 B.R. 525, 543-44 (Bankr. W.D. Mo. 2000), Congress has carved out express, statutory exceptions to the discharge.  <u>See</u> 11 U.S.C. §523(a).  These exceptions are construed strictly against creditors and liberally in favor of debtors.  <u>E.g.</u>, <u>In re Cohn</u>, 54 F.3d 1108, 1113 (3d Cir. 1995); <u>In re Vidal</u>, 2012 WL 3907847, at *15 (Bankr. E.D. Pa. Sept. 7, 2012).

Generally speaking, for a debt to be nondischargeable under §523(a), the plaintiff must establish two (2) elements.  The debt itself must be valid and the debt must satisfy all of the requirements of one of the subsections of §523(a).  <u>See</u> <u>In re August</u>, 448 B.R. 331, 346-47

(Bank. E.D. Pa. 2011) (citing cases).[15]

A creditor objecting to the dischargeability of an indebtedness bears the burden of proof.

Cohn, 54 F.3d at 1113; In re Bittar, 2012 WL 1605160, at *2 (Bankr. D.N.J. May 8, 2012).  The

creditor must establish the nondischargeability of a debt by a preponderance of the evidence.

Grogan v. Garner, 498 U.S. 279, 291 (1991); Cohn, 54 F. 3d at 1113; August, 448 B.R. at 357

(citations omitted).


## B.  11 U.S.C. §523(a)(2)

Section 523(a)(2) provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title
> does not discharge an individual debtor from any debt–
>
> > (2) for money, property, services, or an extension, renewal, or refinancing
> > of credit, to the extent obtained, by–
> >
> > (A) false pretenses, a false representation, or actual fraud, other than a
> > statement respecting the debtor's or an insider's financial condition . . . .

11 U.S.C. §523(a)(2).

Courts have distinguished among the grounds for dischargeability under §523(a)(2), i.e.,

false pretenses, false representations, and actual fraud.  See, e.g., In re Giquinto, 388 B.R. 152,

165 n. 26 (Bankr. E.D. Pa. 2008) (citations omitted); see also August, 448 B.R. at 349-50

(distinguishing between false pretenses and false representations); 4 Collier on Bankruptcy ¶

523.08[1][d], [e] (Alan N. Resnick, Henry J. Sommer eds., 16th ed. 2009) ("Collier").

---

[15]    The term " debt" under the Bankruptcy Code includes debts that are disputed.  11 U.S.C.
§101(5), (12).  In my analysis, I have assumed arguendo that the Plaintiffs hold a valid claim under
applicable nonbankruptcy law and have focused solely on whether the Plaintiffs have satisfied  all of the
requirements of any of the subsections of §523(a).

In an earlier decision, I summarized the distinctions among these §523(a)(2) concepts as

follows:

> Courts have regarded "false representations" as involving affirmative statements
> that are false or misleading. "False pretenses," on the other hand, entail implied
> misrepresentations, omissions, or failures to disclose material facts that create a
> false impression which is known to the debtor.  As for "actual fraud," some courts
> have held that the term refers to conduct other than classic factual
> misrepresentations, which involve "any deceit, artifice, trick, or design involving
> direct and active operation of the mind, used to circumvent and cheat another."
> Other courts, however, have held the statutory term "false pretenses, a false
> representation, or actual fraud" is a term of art encompassing only those species
> of fraud involving misrepresentation of fact.

In re Ricker, 475 B.R. 445, 456 (Bankr. E.D. Pa. 2012) (citations omitted).

In order for a debt to be determined nondischargeable under §523(a)(2)(A) based on false

pretenses or false representations, a plaintiff must prove that:

1.  the debtor expressly or impliedly made a false representation;

2.  at the time of the representation, the debtor knew or believed it was false;

3.  the false representation was made with the intent and purpose of deceiving the
    creditor;

4.  the creditor justifiably relied upon the representation; and

5.  the creditor sustained damage as a proximate result of the misrepresentation.[16]

## C.  11 U.S.C. §523(a)(4)

---

[16]    See, e.g., In re Deitz, 760 F.3d 1038, 1050 (9th Cir. 2014); In re Freier, 604 F.3d 583,
587 (8th Cir. 2010); In re Feldman, 506 B.R. 222, 228 (Bankr. E.D. Pa. 2014); In re Grasso, 497 B.R. 434,
442 (Bankr. E.D. Pa. 2013);  In re Ritter, 404 B.R. 811, 822 (Bankr. E.D. Pa. 2009); In re Feld, 203 B.R.
360, 365 (Bankr. E.D. Pa. 1996).

Section 523(a)(4) provides that a debtor will not be discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]"

Section 523(a)(4) renders nondischargeable three (3) distinct types of debts: (1) certain debts arising while the debtor was acting in a fiduciary capacity; (2) debts arising from embezzlement; and (3) debts arising from larceny.  In this adversary proceeding, the Plaintiffs invoke the first category under §523(a)(4): the fiduciary prong.[17]

To prevail under the fiduciary prong of § 523(a)(4), a plaintiff first must prove that the debtor was acting in a fiduciary capacity.  Once the threshold fiduciary relationship has been established, a plaintiff must then prove fraud or defalcation.  Fraud involves "intentional deceit, rather than implied or constructive fraud."  In re Tyson, 450 B.R. 514, 522 (Bankr. E.D. Pa. 2011) (citations omitted).  Defalcation is the failure to fully account for funds handled in a fiduciary capacity.  See, e.g., In re Pearl, 502 B.R. 429, 440 (Bankr. E.D. Pa. 2013).  Recently in Bullock v. BankChampaign, N.A., the Supreme Court held that defalcation requires a level of scienter "involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior."  133 S. Ct. 1754, 1757 (2013).

The critical issue in this case is whether N. Bayer was acting as a fiduciary in connection with the asset sale transaction that gives rise to the Plaintiffs' claims.  The term "fiduciary" has a specialized meaning under §523(a)(4) and I will return to the subject in a more fulsome discussion in Part V.B.3.a.-c., infra.

---

[17]     The non-fiduciary prongs of §523(a)(4) except from discharge any debt for embezzlement or larceny.  They are not applicable in this adversary proceeding.

## D.  11 U.S.C. §523(a)(6)

Section 523(a)(6) of the Bankruptcy Code excepts from discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity."  Aside from an injury to an entity or its property, section 523(a)(6) has two primary requirements, i.e., the debtor's conduct must be both willful and malicious.

A willful injury is an injury that is done deliberately or intentionally.  In re Coley, 433 B.R. 476, 497 (Bankr. E.D. Pa. 2010) (citing Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998)). Case law in the Third Circuit instructs that "actions taken for the specific purpose of causing an injury as well as actions that have a substantial certainty of producing injury are 'willful' within the meaning of §523(a)(6)."  Coley, 433 B.R. at 497 (citing In re Conte, 33 F.3d 303, 307-09 (3d Cir. 1994)).

"Malice does not mean the same thing for nondischargeability purposes under § 523(a)(6) as it does in contexts outside of bankruptcy."  In re Wooten, 423 B.R. 108, 130 (Bankr. E.D. Va. 2010) (citation omitted); see also Conte, 33 F.3d at 308.  No specific showing of actual malice is required.  Conte, 33 F.3d at 308 (citing St. Paul Fire & Marine Ins. Co. v. Vaughn, 779 F.2d 1003, 1009 (4th Cir. 1985)).  "In bankruptcy, debtor may act with malice without bearing any subjective ill will toward plaintiff creditor or any specific intent to injure same."  Wooten, 423 B.R. at 130 (citation omitted); see also Vidal, 2012 WL 3907847, at *28. Rather, malice encompasses an injury that is "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will."  In re Jacobs, 381 B.R. 128, 136, 138-39 (Bankr. E.D. Pa. 2008) (quoting 4 Collier on Bankruptcy ¶ 523.12[2] (15th rev. ed. 2007)). Malice may be established by the debtor's actions as well as the surrounding circumstances.

-13-

Jacobs, 381 B.R. at 137; accord  St. Paul Fire & Marine Ins. Co., 779 F.2d at 1010 ("Implied

malice, which may be shown by the acts and conduct of the debtor in the context of their

surrounding circumstances, is sufficient under 11 U.S.C. § 523(a)(6)").


# V.  DISCUSSION

The Plaintiffs' nondischargeability claim is based, essentially, on their allegation that N.

Bayer engineered the asset sale transaction for his own benefit, in violation of his duty to act in

the best interest of SCI and its shareholders.  To carry out this asserted "scheme," the Plaintiffs

claim that N. Bayer: (1) issued shares in SCI to friendly third-parties in a purposeful effort to

dilute the voting power of shareholders, such as the Plaintiffs, who were likely to oppose the sale

transaction; and (2) concealed material facts from the shareholders, such as the terms of the

proposed transaction and N. Bayer's future employment with the purchasing entity.

That said, the Plaintiffs' legal claims and arguments throughout this proceeding have not

been presented with much precision.  For example, their joint post-trial brief did not differentiate

between the respective claims of Larson and G. Bayer, did not identify the elements required to

establish dischargeability under any applicable provisions of the Bankruptcy Code and did not

explain how those elements were satisfied by facts developed in the evidentiary record.  Rather,

the Plaintiffs seem to have assumed (incorrectly) that the cause of action for breach of fiduciary

duty by a corporate officer or director under state law corresponds to "fraud or defalcation while

acting in a fiduciary capacity" under 11 U.S.C. §523(a)(4).  Also unexplained is the Plaintiffs'

reference in the Amended Complaint to themselves as plaintiffs suing "individually and on

behalf of [SCI]."  Therefore, to analyze properly the issues before me, I find it necessary to

examine separately the legal status and potential claims of each Plaintiff.

### A.  Plaintiff John Larson

### 1.  Claims Asserted and the Capacity in Which They Were Asserted

In the Amended Complaint, Larson asserted that his claim against N. Bayer is nondischargeable under §§523(a)(2) and (a)(4).[18]  Larson reasserted these claims in the Joint Pretrial Statement, stating that §523(a)(2) claim is based on N. Bayer's actions in acquiring the proxy of Larson's voting rights and that the §523(a)(4) claim is based on N. Bayer's alleged breach of fiduciary duty owed to the Plaintiffs in their capacities as shareholders of SCI.

Reading  the Amended Complaint and the Joint Pretrial Statement together, I understand Larson to assert: (1) an individual claim under §523(a)(2) based on his personal rights embodied in the Separation Agreement; and (2) a derivative claim (along with G. Bayer) on behalf of SCI under §523(a)(4) that N. Bayer committed a nondischargeable breach of fiduciary duty to the corporation.  (1 N.T. at 205; see also 2 N.T. at 50 (counsel stating that any recovery on the

---

[18]     The Amended Complaint arguably also incorporated by reference Counts III, IV and VI of the Illinois State Court complaint and, in doing so, created some ambiguity in connection with the §523(a)(4) claim.

Count III of the State Court complaint states a claim for fraudulent inducement by Larson individually against SCI and N. Bayer in connection with the Separation Agreement.  The incorporation of this state law claim probably was intended to align with Larson's nondischargeability claim under §523(a)(2).

Count IV of the State Court complaint asserts a claim for breach of fiduciary duty by N. Bayer.  Count VI is a claim for civil conspiracy.  The Amended Complaint's reference to these claims probably relates to the §523(a)(4) claims.

Plaintiffs' claims "goes to SCI")).[19]

One other potential claim must be considered: a potential nondischargeability claim

under §523(a)(6) that arguably was tried by consent.  See Part II.C, supra.


## 2.  11 U.S.C. §§523(a)(2)

N. Bayer acquired Larson's voting proxy through the September 13, 2006 Separation

Agreement.  Thus, the terse statement in the Joint Pretrial Statement, that Larson's §523(a)(2)

claim is based on "[N. Bayer's] actions in acquiring the voting rights to [Larson's] shares," (Jt.

Pt. Stmt.¶ V.A.1.), suggests that Larson's legal theory is that N. Bayer fraudulently induced him

into entering into that agreement.

Larson presented no evidence in support the §523(a)(2) claim at trial.  In his testimony,

Larson referred only to such concepts as "breach of fiduciary duty," "tortious interference,"

"conspiracy" and "breach of the September [Separation] Agreement."  (1 N.T. at 205-07).  The

record is devoid of any evidence that N. Bayer made any factual misrepresentations or intended

to deceive Larson at the time of the entry into the Separation Agreement, both necessary

elements of a §523(a)(2) claim.  See Part IV.B., supra.  Nor did Larson address the §523(a)(2)

claim in his post-trial brief.

If a claim is at least raised at trial, it is not necessarily waived solely because it is not

---

[19]     As will be discussed below in Part V.B.3.b., where nonbankruptcy corporate law is
relevant in this proceeding, Georgia and Illinois law may be consulted interchangeably.  Under Georgia
law, to bring a derivative action, a shareholder must make a written demand "upon the corporation to take
suitable action," and allow ninety (90) days for the officers and directors to remedy the alleged
misconduct or wrongful action or inaction.  See Ga. Code §14-2-742.  The Plaintiffs made such a written
demand.  (See G. Bayer's February 27, 2008 letter to N. Bayer) (attached as Ex. B to the Illinois State
Court complaint attached to Plaintiff's Amended Complaint).

expressly asserted in post-trial submissions.  See Main, Inc. v. Blatstein, 2000 WL 1796417, at

*14 (E.D. Pa. Nov. 28, 2000).  However, when a party neither mentions nor makes any argument

during trial or in its post-trial submissions regarding claims asserted in its complaint, that party

has waived those claims that it has not discussed.[20]

In this case, based upon the lack of evidence presented at trial and the complete omission

of any argument in support of §523(a)(2) in post-trial briefing, I am satisfied that Larson

abandoned the claim.  See Laramie Associates, 1997 WL 67848, at *12.  Alternatively, I

conclude that Larson has not met his burden of proof on the claim by failing to present any

evidence of factual misrepresentations or an intent to deceive.  Therefore, I will enter judgment

in favor of N. Bayer and against Larson on the §523(a)(2) claim.


### 3.  11 U.S.C. §523(a)(4)

Larson's §523(a)(4) claim is a derivative claim brought on behalf of SCI.  To have

standing to maintain a derivative action, a shareholder must establish, inter alia, that he or she

was "a shareholder of the corporation at the time of the act or omission complained of or became

a shareholder through transfer by operation of law from one who was a shareholder at that time."

Ga. Code §14-2-741(1). However, Larson's shareholder status during the relevant time period is

hardly clear.  Larson may not have been a shareholder of SCI when the asset sale transaction

---

[20]     In re Laramie Associates, Ltd.,1997 WL 67848, at *12 (Bankr. E.D. Pa. Feb. 12, 1997)
(citations omitted); see In re Johnson, 242 B.R. 283, 288-89 (Bankr. E.D. Pa. 1999) (finding §523(a)(6)
claimed waived because "[t]he Plaintiff filed a comprehensive brief which addressed, at length, its claims
asserted under §§ 523(a)(2)(A), (a)(2)(B), and (a)(4) but did not address its claims under § 523(a)(6) at
all"); see also In re Strong, 356 B.R. 121, 136-37 (Bankr. E.D. Pa. 2004) (per Fox, J.) (stating in dicta,
that even if an issue is not "expressly withdrawn at trial," a claim can still be waived by its omission from
a party's post-trial submissions).

occurred.

At the shareholder meeting, G. Bayer asserted that Larson sold his shares to him just prior to the meeting.  On this basis, the Plaintiffs have long contended that N. Bayer had no right to use the Larson proxy at the meeting.   This contention gives rise to other questions.  How could Larson transfer his shares to G. Bayer without first giving SCI the first option, as provided in the Separation Agreement?[21]  If Larson had the unfettered right to transfer his shares (notwithstanding the Separation Agreement) and did so by transferring them to G. Bayer and has not been a shareholder of SCI since June 2007, how can he sue derivatively on behalf of SCI based on the wrongfulness of the asset sale that occurred after he was no longer a shareholder?

Rather than resolve these issues, upon which the parties have barely touched, I will assume arguendo, for purposes of resolving Larson's §523(a)(4) claim, that Larson remained a shareholder of SCI and I will evaluate the claim on the merits.  I defer my discussion of the merits Larson's §523(a)(4) claim to Part V.B.3., infra, where I will discuss it in conjunction with G. Bayer's §523(a)(4) claim.[22]

---

[21]    Larson appears to assume that SCI's option to purchase the shares was void due to SCI's breach of its obligations under the Separation Agreement.  This assumption, that SCI's breach of the Separation Agreement gave rise to a right to rescind the contract, is not obvious.  Upon SCI's monetary breach of its installment payment obligation; Larson's remedy may have been limited to a claim for monetary damages.  See Restatement (Second) of Contracts §§236, 344-46 (injured party has right to damages upon breach).  Cf. Restatement (Third) Restitution §37(2) (rescission is not an available remedy "against a defendant whose defaulted obligation is exclusively an obligation to pay money"); id. §54 (setting forth various requirements for exercise of right of rescission).

I also note that the Plaintiffs assume that rescission of the Separation Agreement would reverse the effect of an irrevocable proxy invoked prior to rescission.  Perhaps so, but perhaps not.

[22]    It is clear from the record that Larson was a creditor of SCI in June 2007 based on SCI's breach of its payment obligations to him under the Separation Agreement that occurred after September 2006.  It is a common, state law legal principle that officers and directors of a corporation owe a fiduciary

(continued...)

### 4.  11 U.S.C. §523(a)(6)

Assuming <u>arguendo</u> that Larson was a SCI shareholder at the relevant time, his potential

§523(a)(6) claim, <u>see</u> Part II, <u>supra</u>, is an offshoot of the Plaintiffs' core theory of the case, as

articulated in their post-trial brief, <u>i.e.</u>, that:

- N. Bayer breached his fiduciary duty to SCI and its shareholders by
  failing to disclose multiple conflicts of interest, and refusing to
  provide
  the shareholders with the terms of the transaction being contemplated;
  and

- N. Bayer's wrongful conduct was intentional and not innocent or
  merely negligent.

(Plaintiffs' Post-Trial Brief at 2, 7) (Doc. #70).

The entire discussion in the Plaintiffs' brief is couched entirely in terms of N. Bayer's

alleged breach of fiduciary duty under nonbankruptcy law.  The brief nowhere mentions

§523(a)(6) in connection with the Plaintiffs' claims against N. Bayer.  This could not have been

an oversight.  Indeed, within the same brief, Larson pressed a §523(a)(6) claim against Grasso.

Based upon the absence of any reference to §523(a)(6) in the Amended Complaint and

the Joint Pretrial Statement and the complete omission of any argument in support of §523(a)(6)

in post-trial briefing, I find that Larson's §523(a)(6) claim against N. Bayer is waived.  <u>Laramie</u>

<u>Associates</u>, 1997 WL 67848, at *12.

---

[22](...continued)
duty to creditors once the corporation becomes insolvent.  <u>See, e.g.</u>, <u>In re Berman</u>, 629 F.3d 761, 766 (7th
Cir. 2011).  However, Larson has not made any §523(a)(4) argument, either expressly or impliedly, based
on his creditor status, as opposed to his shareholder status.  Accordingly, the argument was waived and it
is unnecessary to decide whether any state law fiduciary duties N. Bayer owed to creditors of SCI due to
SCI's insolvency created a fiduciary relationship for federal law purposes under §523(a)(4).  <u>See</u>
<u>generally</u> <u>id.</u> at 766-67 (collecting cases pro and con).  <u>See also</u> nn. 28, 31, <u>infra</u>.

Judgment will be entered in favor of N. Bayer and against Plaintiff Larson under §523(a)(6).

## B. Plaintiff G. Bayer

### 1. Claims Asserted and the Capacity in Which They Were Asserted

The Amended Complaint did not distinguish G. Bayer's claims from Larson's. Thus, his claims, too, were based on 11 U.S.C. §§523(a)(2) and (a)(4), with the latter claim being brought derivatively on behalf of SCI. In the Joint Pretrial Statement, however, G. Bayer limited his claim to §523(a)(4). Thus, any §523(a)(2) claim was abandoned, leaving only the §523(a)(4) claim and, possibly, a §523(a)(6) claim.

### 2. 11 U.S.C. §§523(a)(6)

In the post-trial briefing, G. Bayer addressed only his §523(a)(4) against N. Bayer.[23] Given the absence of any reference to §523(a)(6) in the Amended Complaint or the Joint Pretrial Statement and a complete omission of any argument in support of a §523(a)(6) claim by G. Bayer in post-trial briefing, I find that any §523(a)(6) claim that G. Bayer may have tried by consent has been waived. Laramie Associates, 1997 WL 67848, at *12.

Judgment will be entered in favor of N. Bayer and against Plaintiff G. Bayer under 11 U.S.C. §523(a)(6).

### 3. 11 U.S.C. §523(a)(4)

---

[23] As already explained, I find this omission was not an oversight; in the same brief, the Plaintiffs pressed a §523(a)(6) claim against Grasso.

In dischargeability proceedings under 11 U.S.C. §523(a)(4), it is sometimes difficult to ascertain whether a debtor was acting "in a fiduciary capacity" within the meaning of the Bankruptcy Code.  The determination requires consideration of three (3) sources that bankruptcy courts consult in rendering decisions in §523(a) proceedings: (1) the facts regarding the nature of the relationship between the debtor and the creditor; (2) the treatment of the debtor-creditor relationship under applicable nonbankruptcy law; and (3) historic bankruptcy dischargeability policy under §523(a)(4).  These sources may push and pull a court in different directions.

As explained below, I conclude that the Plaintiffs have not established that N. Bayer was acting in a fiduciary capacity when  Plaintiffs' (disputed) claim against him arose.  Therefore, the §523(a)(4) claim is without merit.

### a.  legal principles governing determination of fiduciary status under §523(a)(4)

The rationale for the nondischargeability of debts for fraud or defalcation while acting in a fiduciary capacity, see 11 U.S.C. §523(a)(4), was summarized by one Court of Appeals as follows:

> Bankruptcy is both a creditor's remedy and a debtor's right. The discharge of the bankrupt's debts is an essential feature of the second function; it is what enables the bankrupt to get a "fresh start." It is also, depending on the bankrupt's future income prospects, a potentially great harm to creditors. When the bankrupt is a trustee and the creditor a beneficiary of the trust, the balance has been deemed to incline against discharge. Nondischarge becomes another token of the law's imposition of the highest standard of loyalty and care on trustees. In a trust relationship the settlor and  beneficiary repose "trust" in a literal sense in the trustee, and the abuse of that trust is considered a serious wrong.

Matter of Marchiando, 13 F.3d 1111, 1115 (7th Cir. 1994) (per Posner, J.).

Historically, the United States Supreme Court has instructed that the term "fiduciary," as

it is used in §523(a)(4), is to be construed narrowly.  As far back as 1934, the Court stated that

"the statute speaks of technical trusts, and not those which the law implies from the contract."

Davis v. Aetna Acceptance Co., 293 U.S. 328, 333 (1934) (internal quotations and citation

omitted).  See also Upshur v. Briscoe, 138 U.S. 365, 375 (1891) ("Within the meaning of the

exception in the bankruptcy act, a debt is not created by a person while acting in a 'fiduciary

character,' merely because it is created under circumstances in which trust or confidence is

reposed in the debtor, in the popular sense of those terms").

　　　Thus, the term "fiduciary capacity generally has a narrower meaning in bankruptcy than

its traditional common law definition."  In re Dawley, 312 B.R. 765, 777 (Bankr. E.D. Pa. 2004)

(internal quotations omitted).[24]  The key inquiry is to distinguish "§523(a)(4) fiduciaries" from

mere agents or representatives.  See, e.g., In re Scott, 203 B.R. 590, 596-97 (Bankr. E.D. Va.

1996); In re Reeves, 124 B.R. 5, 9-10 (Bankr. D.N.H. 1990).  In other words, §523(a)(4) is not

intended to apply to an ordinary commercial or contractual relationship.  See, e.g., In re Lowery,

440 B.R. 914, 926 (Bankr. N.D. Ga. 2010); Coley, 433 B.R. at 496.

　　　In determining whether the requisite fiduciary relationship exists, bankruptcy courts look

"for guidance" to applicable nonbankruptcy state law.[25]  However, consistent with the Supreme

---

[24]　　　Accord In re Patel, 565 F.3d 963, 968 (6th Cir. 2009); Matter of Tran, 151 F.3d 339, 342
(5th Cir. 1998); Quaif v. Johnson, 4 F.3d 950, 953 (11th Cir. 1993).

[25]　　　In re Humphries, 516 B.R. 856, 867 (Bankr. N.D. Miss. 2014); see also  F.D.I.C. v.
Jackson, 133 F.3d 694, 703 (9th Cir. 1998); In re Young, 91 F.3d 1367, 1371 (10th Cir. 1996); In re
Lorenzo, 434 B.R. 695, 709 (Bankr. M.D. Fla. 2010); Coley, 433 B.R. at 495; In re Marques, 358 B.R.
188, 194 (Bankr. E.D. Pa. 2006); see also In re Hayes, 183 F.3d 162, 167 (2d Cir. 1999) ("federal law sets
the outer boundaries of the [§523(a)(4) discharge] exception, while state law may, through lesser or
greater regulation of fiduciary obligations, affect the application of the provision").

(continued...)

Court's admonition in <u>Davis</u> of the limited nature of a §523(a)(4) fiduciary, the mere fact that the

parties' relationship may have some of the characteristics of a fiduciary relationship under state

law, does not necessarily mean that the relationship is a fiduciary one under § 523(a)(4).[26]  The

Seventh Circuit has stated this general principle directly: "Not all persons treated as fiduciaries

under state law are considered to 'act in a fiduciary capacity' for purposes of federal bankruptcy

law." <u>In re Berman</u>, 629 F.3d 761, 767 (7th Cir. 2011).  State law "cannot magically transform

ordinary agents, contractors, or sellers into fiduciaries by the simple incantation of the terms

'trust' or 'fiduciary.'"[27]

A fiduciary relationship exists under §523(a)(4) if an express or technical trust is present.

<u>E.g.</u>, 4 <u>Collier</u> at ¶ 523.10[1][d]; <u>Coley</u>, 433 B.R. at 495 (citing authorities).  An express trust is

one "created with the settlor's express intent, usually declared in a writing."  <u>In re Thompson</u>,

458 B.R. 504 (B.A.P. 8th Cir. 2011) (quoting Blacks Law Dictionary 1650 (9th ed. 2009)

(alterations omitted); <u>accord</u> <u>In re Keogh</u>, 509 B.R. 915, 933 (Bankr. E.D. Mo. 2014) (same).  A

technical trust is usually described as one created by statute or common law.  <u>E.g.</u>, <u>Keough</u>, 509

---

[25](...continued)

[26]     4 <u>Collier</u> ¶ 523.10[1][d]; <u>see also</u> <u>In re Smith</u>, 386 B.R. 618 (Bankr. N.D. Miss. 2007); <u>In re Pasco</u>, 1998 WL 2017635, at *4 (Bankr. D.S.C. Oct. 28, 1998).

[27]     <u>In re Nail</u>, 680 F.3d 1036, 1040 (8th Cir. 2012) (quoting <u>Tran</u>, 151 F.3d at 342–43)); <u>accord</u> <u>In re Bucci</u>, 493 F.3d 635, 639-40 (6th Cir. 2007); <u>In re Cantrell</u>, 329 F.3d 1119, 1125-27 (9th Cir. 2003).

B.R. at 933.[28]

Further, under §523(a)(4), the trust relationship must pre-exist the alleged defalcation or

fraud. Neither a constructive trust nor a resulting trust, each of which is imposed as a matter of

law after the fact due to the conduct of the parties, creates a fiduciary relationship under

§523(a)(4). E.g., In re Pervis, 497 B.R. 612, 640 (Bankr. N.D. Ga. 2013); Dawley, 312 B.R. at

777.

The typical elements of an express trust under applicable nonbankruptcy law are:

(1) a trust res;

(2) a beneficiary; and

(3) a trustee obligated to administer the res for the benefit of the beneficiary.[29]

Similarly, a technical trust created by statute or common law must:

(1) define the trust res;

(2) spell out the trustee's fiduciary duties to a beneficiary; and

(3) impose the trust prior to and without reference to the wrong that created the

---

[28]    Accord Jenkins v. IBD, Inc., 489 B.R. 587, 597 (D. Kan. 2013); In re Lapeyre, 2001 WL
753792, at *9 (E.D. La. July 3, 2001); In re Mele, 501 B.R. 357, 365 (B.A.P. 9th Cir. 2013); In re Fahey,
482 B.R. 678, 688 (B.A.P. 1st Cir. 2012); In re Bagel, 1992 WL 477052, at * 12 (Bankr. E.D. Pa. Dec.17,
1992); see also In re Librandi, 183 B.R. 379, 382-83 (M.D. Pa. 1995) ("Some courts have determined that
state statutes can create a technical trust for purposes of section 523(a)(4). . . . Other courts have held
that state common law can create the requisite fiduciary relationship."); In re Kaczynski, 188 B.R. 770,
774 (Bankr. D.N.J. 1995) (same).

[29]    See, e.g., Villas at Bailey Springs Homeowners Ass'n, Inc. v. LarRicci, 2011 WL
4591962, at *3 n.4 (M.D. Pa. Sept. 30, 2011); In re Smith, 517 B.R. 793, 799 (Bankr. E.D. Mich. 2014);
In re Hesse, 516 B.R. 491, 495 (Bankr. S.D. Ohio 2014); In re Quarles, 2014 WL 29740, at *5 (Bankr. D.
Colo. Jan. 3, 2014); Coley, 433 B.R. at 495 n.28.

debt.[30]

### b.  choice of law

The precise issue in this adversary proceeding is whether N. Bayer was a fiduciary to SCI

and its shareholders, for purposes of 11 U.S.C. §523(a)(4), by virtue of his status as an officer

and director of SCI. The determination of this issue requires consideration of state law.

Accordingly, the first question is: what state's substantive law should be considered?

The parties have not addressed this issue.[31]  I conclude that I may consult Georgia and

Illinois law interchangeably in determining whether N. Bayer was acting in a fiduciary capacity

under 11 U.S.C. §523(a)(4).

Generally, a federal court applies the choice-of-law rules of the state in which it sits.

Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941); accord In re Dombrowski, 478 B.R.

198, 203 (Bankr. M.D. Pa. 2012); In re Buffalo Molded Plastics, Inc., 354 B.R. 731, 750 (Bankr.

W.D. Pa. 2006)). I must apply Pennsylvania's choice of law principles because this court sits in

Pennsylvania.  E.g., In re Eagle Enterprises, Inc., 223 B.R. 290, 292 (Bankr. E.D. Pa. 1998)

(stating that bankruptcy courts generally "rely on the rule observed by federal district courts

---

[30]     See e.g., In re Bucci, 493 F.3d 635, 640 (6th Cir. 2007); In re Donald Hanft, M.D., P.A., 315 B.R. 617, 623 (S.D. Fla. 2002);  In re Hunt, 2013 WL 1723795, at *10 (Bankr. D. Conn. Apr. 22, 2013); In re Lampe, 477 B.R. 576, 582 (Bankr. E.D. Pa. Aug. 14, 2012); In re Bolanos, 475 B.R. 641, 646 n.2 (Bankr. N.D. Ill. 2012); In re Moran, 413 B.R. 168, 186 (Bankr. D. Del. 2009).

[31]     In their post-trial brief, the Plaintiffs cite Illinois law (exclusive of one Delaware law case) for the general proposition that N. Bayer owed a fiduciary duty to the Plaintiffs.   (See Plaintiffs' Post-Trial Brief at 2).  N. Bayer has not questioned the Plaintiffs' use of Illinois substantive law (although he denies that he breached any fiduciary duty that may have existed).  (Defendant's Post-Trial Brief at 4). However, neither side engaged in a choice of law analysis.

hearing diversity cases and use the choice of law rules of the forum state.").

Pennsylvania employs a two (2) step choice of law analysis.  The first step is to determine whether a "false conflict" exists.  See  LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071 (3d Cir. 1996).  Where the application of the law of two (2) jurisdictions does not produce different results on an issue, there is no actual conflict, i.e., there is a false conflict.  Berg Chilling Sys. Inc. v. Hull Corp., 435 F.3d 455, 462 (3d Cir. 2006).  In the case of a false conflict, the court should avoid deciding the conflict of laws issue.  Id.  In other words, the court is free to choose the law of either jurisdiction.  If there is no false conflict (i.e., there is a conflict), the court proceeds to the second step, determining which state has the greater interest in the application of its law.  Id. at 463.

The two (2) states with interests in this matter are Georgia (the state of SCI's incorporation) and Illinois (the parties' home state when the state court complaint was filed).

The Georgia Business Corporation Code requires officers and directors to discharge their duties "in good faith," "in the best interests of the corporation," with the care of "an ordinarily prudent person in a like position."  Ga. Code §§14-2-830(a), 14-2-842(a) (providing the standards of care for directors and officers).

The Illinois Business Corporation Act of 1983,  805 I.L.C.S. §§5/1.01- 5/17.05, is not as explicit as the Georgia Business Corporation Code in delineating the duties of corporate officers and directors.  However, case law confirms that corporate officers and directors are obliged to act with loyalty and good faith in managing the corporation.  E.g., Star Forge, Inc. v. F.C. Mason Co., 2014 WL 2042045, at *3 (Ill. App. 2d Dist. May 16, 2014); Tully v. McLean, 948 N.E.2d 714, 739 (Ill. App. 1st Dist. 2011); Coduti v. Hellwig, 469 N.E.2d 220, 230 (Ill. App. 1st Dist.

-26-

1984).  These duties mandate that corporate officers and directors work for the good of the

corporation and refrain from putting their personal interests ahead of the good of the entity.  E.g.,

Unichem Corp. v. Gurtler, 498 N.E.2d 724, 727 (Ill. App. 1st Dist. 1986); see also In re Haughey,

2005 WL 3077227, at *5 (Bankr. N.D. Ill. Nov. 15, 2005) (corporate officers "have duties of

good faith, loyalty, and honesty; and may not enhance their personal interests at the expense of

the corporation's interests").[32]

The above recitation indicates that Georgia and Illinois law impose similar duties on

corporate officers and directors in relation to the shareholders of the corporation.  I perceive no

material difference between the law of the two jurisdictions.  In both states, corporate officers

and directors owe the corporation a duty of loyalty and good faith.  Thus, there is a false conflict

and I am free to consult the law of either Illinois or Georgia interchangeably in seeking guidance

in applying 11 U.S.C. §523(a)(4).  See, e.g., Lucker Mfg. v. Home Ins. Co., 23 F.3d 808, 813 (3d

Cir. 1994).

### c.  case law

---

[32]     There are numerous references in Illinois court decisions to the duties of a corporate
officer and director being "fiduciary" in nature.  E.g., Brown v. Tenney, 532 N.E.2d 230, 235 (Ill. 1988)
Shlensky v. South Parkway Bldg. Corp., 166 N.E.2d 793, 799 (Ill. 1960); Anest v. Audino, 773 N.E.2d
202, 209 (Ill. App. 2nd Dist. 2002); Coduti 469 N.E.2d at 230; Karris v. Water Tower Trust & Sav. Bank,
389 N.E.2d 1359, 1369 (Ill. App. 1st  Dist. 1979).  Such a label under state law is not dispositive in the
context of a bankruptcy dischargability matter.  11 U.S.C. §523(a)(4) does not incorporate state fiduciary
law; it requires only that the bankruptcy court consult state law before applying the Bankruptcy Code
concept of "fiduciary."  The critical issue is whether the characteristics of the state law duties create a
fiduciary relationship under federal law.  Here, the key characteristics of the relationship are the duties of
loyalty and good faith owed to the corporation by officers and directors.

Much judicial ink has been spilled on the issue presented in this adversary proceeding:

whether a corporate officer/director is a fiduciary to the corporation under 11 U.S.C. §523(a)(4).

Most of the case law begins with the same reference point insofar as the law governing duties of

corporate officers and directors in many, if not all, jurisdictions mirrors the law in Georgia and

Illinois. Yet, the reported case law under §523(a)(4) is hopelessly divided[33] and there is no

binding precedent in this Circuit.[34]

Given that the relevant corporate law is that of Georgia and Illinois, I first consider the

case law from the courts that have decided §523(a)(4) proceedings based on the law of those two

(2) jurisdictions.

The reported bankruptcy decisions from Georgia federal courts have held that a debtor's

---

[33]    See, e.g., In re D'Abrosca, 2011 WL 4592338, at *6 (B.A.P. 1st Cir. Aug. 10, 2011)
(nonprecedential) (collecting cases); In re Heilman, 241 B.R. 137, 153 n.10 (Bankr. D. Md. 1999) (same);
see also Berman, 629 F.3d at 766-67 (collecting cases on related issue whether officer and director is a
§523(a)(4) fiduciary to creditors of the corporation upon corporate insolvency).

[34]    Bloemecke v. Applegate, 271 F. 595 (3d Cir. 1921), (decided under §523(a)(4)'s
predecessor provision, §17 of the Bankruptcy Act) has been cited for the proposition that corporate
officers and directors are fiduciaries for nondischargeability purposes merely by virtue of their corporate
position.  See, e.g., In re Wolfington, 48 B.R. 920, 924 (Bankr. E.D. Pa. 1985).  A later decision, In re
Docteroff, 133 F.3d 210 (3d Cir. 1997) has been read the same way.  See In re Casini, 307 B.R. 800, 819
(Bankr. D.N.J. 2004); see also In re Carrettta, 219 B.R. 66, 75-76 (Bankr. D.N.J. 1998).  However, both
Bloemecke and Docteroff involved a corporate officer who misappropriated a discrete asset of the
corporation: corporate funds.  See Bloemecke, 271 F. at 596; Docteroff, 133 F.3d at 213.  Neither case
presents the "pure" issue whether corporate officer or director status, per se, creates §523(a)(4) fiduciary
status.  Accord Dawley, 312 B.R. at 778 (distinguishing Wolfington on the same basis).

Docteroff is inapposite for two (2) other reasons.  First, the relationship at issue was
between a director and a creditor of an insolvent subsidiary corporation (not between an officer and
director and his own corporation).  See Docteroff, 133 F.3d at 216-17.  Second, the bankruptcy court and
the Third Circuit appeared to be applying Washington law, while the preceding sub judice involves a
director/shareholder relationship under Illinois law.  See id. at 216 n.2.

-28-

status as an officer or director of a Georgia corporation does not, by itself, create a fiduciary

relationship between the officer or director and the corporation within the meaning of 11 U.S.C.

§523(a)(4).[35] One court concisely articulated the rationale for this holding: "A general duty of

good faith [imposed by Ga. Code §§14-2-830, 14-2-842] does not rise to the level of an express

or technical trust of the kind required for nondischargeability." Sutton, 2008 WL 4527761, at

*3.  Another court added: "These Georgia statutes do not impose a heightened duty on the

officer or director and do not use the term 'fiduciary' to describe the duties or in any way speak

in terms of a trust." Pervis, 497 B.R. at 640.[36]

The analysis of the Illinois federal court decisions are influenced heavily by two (2)

Seventh Circuit decisions: Marchiando, decided in 1994, and In re Frain, 230 F.3d 1014 (7th Cir.

---

[35]    See Pervis, 497 B.R. at 639-40; In re Barbee, 479 B.R. 193, 207 (Bankr. S.D. Ga. 2012); In re Riddle, No. 10–4088, 2011 WL 2461896, at *3-4 (Bankr. N.D. Ga. Apr. 6, 2011); In re Miles,  2011 WL 1124183, at *4 (Bankr. N.D. Ga. Mar. 14, 2011); In re Sutton, 2008 WL 4527761, at *3 (Bankr. M.D. Ga. Oct. 2, 2008).

[36]    However, in a closely analogous context, the reported Georgia federal court decisions are divided on the question whether the state law fiduciary obligation a corporate officer or director owes to creditors upon corporate insolvency renders the officer or director a fiduciary under §523(a)(4).  Compare Matter of Funk/Hasard, Inc., 1984 WL 6609, at *6 (M.D. Ga. July 27, 1984) (officers and directors are not §523(a)(4) fiduciaries to creditors upon corporate insolvency); Matter of Dove, 78 B.R. 630, 636-37 (Bankr. M.D. Ga. 1987) (same), with In re Naguszewski, 2009 WL 6499348, at *3 (Bankr. N.D. Ga. Apr. 29, 2009)  (officers and directors are§523(a)(4) fiduciaries to creditors upon corporate insolvency); In re Pharr-Luke, 259 B.R. 426, 430-31 (Bankr. S.D. Ga. 2000) (same).

    I note that the reported Pennsylvania bankruptcy court decisions align in manner similar to the Georgia courts.  The more recent decisions hold that a corporate officer or director is, not per se, a fiduciary to the corporation under §523(a)(4).  Compare Dawley, 312 B.R. at 778-79; In re Johnson, 242 B.R. 283, 294 (Bankr. E.D. Pa. 1999); In re Ramonat, 82 B.R. 714, 718-20 (Bankr. E.D. Pa. 1988), with Wolfington, 48 B.R. at 924.  There also is division on the related issue whether the state law fiduciary obligation a corporate officer or director owes to creditors upon corporate insolvency is a fiduciary relationship under §523(a)(4).  Compare In re Bagel, 1992 WL 477052, at *16 (dictum in that the case involved a corporate liquidating agent, not a corporate officer or director), with In re Clayton, 198 B.R. 878, 882-83 (Bankr. E.D. Pa. 1996) (not a per se fiduciary to the creditors under §523(a)(4)).

2000).  The <u>Marchiando</u> holding was summarized in a subsequent Seventh Circuit opinion as

follows:

> [S]ection 523(a)(4) reaches only those fiduciary obligations in which there
> is substantial inequality in power or knowledge in favor of the debtor
> seeking the discharge and against the creditor resisting discharge[.]

<u>Matter of Woldman</u>, 92 F.3d 546, 547 (7th Cir. 1996).  However, <u>Marchiando</u> also includes the

following passage:

> If we probe more deeply the distinction between the fiduciary relation that
> imposes real duties in advance of the breach and the fiduciary relation that
> does not we find that the first group of cases **involve a difference in
> knowledge or power between fiduciary and principal** . . . .
>
> [T]he cases  . . .  that have held debts nondischargeable by virtue of
> section 523(a)(4) have involved either express trusts of a conventional
> variety or fiduciary **relations of  . . .  inequality that justify the
> imposition on the fiduciary of a special duty**, basically to treat his
> principal's affairs with all the solicitude that he would accord to his own
> affairs.

13 F.3d at 1116 (emphasis added).

In <u>Frain</u>, a later Seventh Circuit decision, the court gave several examples of

relationships in which the "inequality of power" justifies treating one party as a fiduciary: "a

lawyer-client relation, **a director-shareholder relation**, or a managing partner-limited partner

relation."  230 F.3d at 1017 (emphasis added).  Then, after examining the details in the record

regarding the relative power and information in the relationship between the debtor-defendant

and the plaintiff-shareholders, the <u>Frain</u> court concluded that the debtor was in "a position of

ascendancy" sufficient to justify treating him as a fiduciary under §523(a)(4).  <u>Id.</u>

Since <u>Frain</u>, Illinois bankruptcy courts regularly cite or quote the passage from <u>Frain</u>

stating that the director-shareholder relationship is a fiduciary one.  These references are dicta,

-30-

however, because the cases did not involve officer or director/shareholder disputes.[37]  And,

significantly, another Illinois bankruptcy court, based on <u>Frain</u>, held that an officer and director's

status alone is insufficient to establish fiduciary status under 11 U.S.C. §523(a)(4).  <u>In re</u>

<u>Vitogiannis</u>, 2009 WL 1372065, at *15-16 (Bankr. N.D. Ill. May 15, 2009).  In <u>Vitogiannis</u>, the

court held that, consistent with <u>Frain</u>, the bankruptcy court must ascertain the relative knowledge

and power of the officer/director through a factual analysis of the corporation's structure and

operations, before finding a fiduciary relationship.  <u>See also</u> <u>Haughey</u>, 2005 WL 3077227, at *5-

6.[38]

     Thus, it is not possible to describe definitively the state of §523(a)(4) law in the Illinois

federal courts.  As I read the decisions, Illinois federal courts have held that an Illinois corporate

officer director is either: (1) a §523(a)(4) fiduciary as a matter of law; or (2) a §523(a)(4)

fiduciary only if a factual record establishes that the debtor was in a "position of ascendancy"

---

[37]     <u>See, e.g.,</u> <u>In re Roberts</u>, 2011 WL 4102540, at *8 (Bankr. N.D. Ill. Sept. 14, 2011); <u>In re</u>
<u>Alomari</u>, 2011 WL 3648630, at *4 (Bankr. N.D. Ill. Aug. 15, 2011); <u>In re Hanson</u>, 432 B.R. 758, 774
(Bankr. N.D. Ill. 2010); <u>In re Fairgrieves</u>, 426 B.R. 748, 755 (Bankr. N.D. Ill. 2010);  <u>In re Blackburn</u>,
415 B.R. 668, 680-81 (Bankr. N.D. Ill. 2009). Prior to <u>Frain</u>, one bankruptcy court squarely held that an
Illinois corporate officer or director is a fiduciary within the meaning of 11 U.S.C. §523(a)(4).  <u>See</u> <u>In re</u>
<u>Volpert</u>, 175 B.R. 247, 260 (Bankr. N.D. Ill. 1994).

[38]     In <u>Haughey</u>, the court articulated the same legal standard as <u>Vitogiannis</u>, but then
appeared to decide, as a matter of law, that an Illinois corporate officer and director is a fiduciary to the
corporation within the meaning of 11 U.S.C. §523(a)(4).  2005 WL 3077227, at *5-6.  All of this was
dictum, because the adversary proceeding was brought by a co-shareholder and director personally and
not derivatively on behalf of the corporation.  <u>Id.</u> at *1.

compared to the other corporate managers.[39]

### d.  this court's resolution of this adversary proceeding

The recitation above illustrates that there are three (3) lines of cases on this issue of federal bankruptcy law that is before this court.

The first line of cases holds that the duties imposed by state statute on a corporate officer and director are sufficiently similar to traditional fiduciary duties as to warrant treating a corporate officer or director as a fiduciary to the corporation (and, according to some courts, as a fiduciary to creditors upon insolvency of the corporation) under 11 U.S.C. §523(a)(4).  These courts perceive the corporate assets as a whole as constituting a trust res being managed and controlled by the officers and directors for the benefit of the corporation (i.e., the shareholders) or, in the case of insolvency, the creditors of the corporation.

The second line holds that the statutorily imposed duty of loyalty and good faith that a corporate officer and director owes to the corporation is insufficient, by itself, to make a corporate officer and director a fiduciary within the meaning of §523(a)(4).  Cases adopting this approach emphasize the historically limited definition of fiduciary in §523(a)(4) and the absence of an identifiable trust res.  They perceive the duty of a corporate officer or director as being similar to the generalized duty of good faith and fair dealing that any party to a contract owes the other party.  They also reject the notion that the corporate assets as a whole, managed by the

---

[39]     On the analogous issue whether the state law fiduciary obligation a corporate officer or director owes to creditors upon corporate insolvency is a fiduciary relationship under §523(a)(4), the Illinois federal courts, like the Georgia federal courts, are divided.  See In re Netzel, 442 B.R. 896, 902-05 (Bankr. N.D. Ill. 2011) (collecting cases, but then holding the fiduciary duty that arises upon insolvency is a general duty owed to all creditors, leaving no individual creditor with standing to sue an officer or director and therefore, no claim under §523(a)(4)).

officer or director to generate corporate profits, constitute a trust <u>res</u> for purposes of §523(a)(4).

A third line of cases rejects either <u>per se</u> rule.  These cases suggest that a fiduciary relationship under §523(a)(4) can be found only on a case-by-case basis.  Under this line, for an officer or director to be a §523(a)(4) fiduciary, the court must examine the actual relationship between the officer or director and the other parties with an interest in the corporation, and find an especial imbalance of power (in terms of corporate decision making or access to material information) as between the officer or director and the other parties with an interest in the corporation.

After careful consideration, I am persuaded by and will follow the reported decisions on the issue from this bankruptcy district, at least insofar as they reject the first line of cases.  <u>See Dawley</u>, 312 B.R. at 778-79; <u>Johnson</u>, 242 B.R. at 294.  In other words, I reject the <u>per se</u> rule that corporate officers or directors are fiduciaries in jurisdictions in which their obligations are those of loyalty and good faith.

This still leaves open whether there is a <u>per se</u> rule that officers or directors are not §523(a)(4) fiduciaries or whether the issue must be determined case-by-case.  In this adversary proceeding, I find it unnecessary to make that choice.  Even under the more expansive test for fiduciary status (the third line), the Plaintiffs have not established that N. Bayer was a fiduciary under §523(a)(4).

The record in this case lacks the essential elements of the severe imbalance of power that is the hallmark of the more expansive view of the bankruptcy term fiduciary that has been adopted in the Seventh Circuit.

Until either mid-2006 or September 2006, both Plaintiffs had been active in the

management and operations of SCI.  There was no obvious imbalance in expertise between N.

Bayer and the Plaintiffs.  True, after September 2006, neither Plaintiff was actively involved in

SCI and therefore, both were dependent on N. Bayer (who was the sole officer and director) for

information regarding the status of the company.  But, his control of business operations by itself

is insufficient to establish the type of domination required to under the third line of §523(a)(4)

cases.  See Frain, 230 F.3d at 1017 ("natural advantage" derived from control of day-to-day

business decisions of the corporation "not sufficient in itself to establish a position of

ascendancy"); see also In re Pawlak, 467 B.R. 462, 475 (Bankr. W.D. Wis. 2012) (in LLC

context, debtor lacked "the sort of 'ultimate power' or unequal control required for him to have a

'position of ascendancy' for purposes of §523(a)(4)").

Nor did the Plaintiffs establish that they were precluded in any way from obtaining

corporate information.  If anything, the record shows that N. Bayer "kept them in the loop"

regarding the status of the most important corporate decisions – obtaining critical financing for

SCI during the period of time in which SCI was in negotiations with Grasso and Meakim.  (See

Ex. P-40; 1 N.T. at 138-39).

Further, even though N. Bayer was the sole officer and director, the corporate transaction

at issue here (the asset sale to the new entity created by Grasso and Meakim) required a

shareholder vote.  N. Bayer did not hold a majority of the voting shares.  Even with the disputed

proxy that he received from Larson, it was not a foregone conclusion that N. Bayer could control

that vote.

In short, while N. Bayer certainly wielded considerable power in SCI as its sole officer

and director, I do not perceive the level of domination of the company necessary to render him a

fiduciary under §523(a)(4).

I am aware that the Plaintiffs assert that N. Bayer kept critical information from them and otherwise acted in an oppressive manner by: (1) failing to disclose the terms of the assets sale; (2) failing to disclose his alleged employment agreement with asset purchaser; and (3) engaging in a strategy to dilute their voting stock so as to control the shareholder vote on the approval of the asset sale.  However, reliance on these asserted facts is to no avail.  These asserted wrongful acts cannot be used to **create** a fiduciary relationship under §523(a)(4).  The fiduciary relationship must precede the alleged wrongful conduct.  E.g., Frain, 230 F.3d at 1017 (the court must consider the relationship as it stood "prior to the alleged wrong").

I conclude that the acts of which the Plaintiffs complain did not occur during the course of a fiduciary relationship.  Therefore, it follows that the Plaintiffs have not established an essential element of their §523(a)(4) claim.[40]

---

[40]     One wonders about the efficacy of this derivative claim, even if the Plaintiffs had prevailed.  Any determination of nondischargeability based on a derivative claim ultimately would run in favor of SCI, not Larson and G. Bayer individually.  Phoenix Airline Servs. v. Metro Airlines, 397 S.E.2d, 699, 701-02 (Ga. 1990) (in derivative action, shareholder sues on behalf of corporation and any damages recovered are paid to corporation); Barnett v. Fullard, 701 S.E.2d 608, 612(Ga. Ct. App. 2010) (same).  All of the parties in this litigation agree that SCI is a defunct, hopelessly insolvent entity with many other creditors.  It is not clear whether G. Bayer is even a creditor of SCI; if not, any recovery from N. Bayer would not reach him as a shareholder.  As for Larson, his claim against SCI likely would be diluted substantially by the claims of SCI's other creditors.  Overall, is difficult to envision how the Plaintiffs expect to benefit personally in any material way from any recovery they might obtain from N. Bayer.

## VI.  CONCLUSION

For the reasons set for above, judgment will be entered in favor of the Defendant N.

Bayer and against the Plaintiffs in this adversary proceeding.  An appropriate order follows.

Date: <u>December 2, 2014</u>    _____

**ERIC L. FRANK**
**CHIEF U.S. BANKRUPTCY JUDGE**