## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE:    NICHOLAS BAYER, | : | |
| | : | **Chapter 7** |
| Debtor. | : | |
| | : | **Bky. No.  12-11083 ELF** |
| | : | |
| ──────────────────────── | : | |
| JOHN LARSON and | : | |
| GREG BAYER, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | **Adv. No. 12-0379 ELF** |
| NICHOLAS BAYER, | : | |
| | : | |
| Defendant. | : | |
| | : | |

# O P I N I O N

## I. INTRODUCTION

In this adversary proceeding, Plaintiffs John Larson ("Larson") and Greg Bayer ("G. Bayer") (collectively, "the Plaintiffs") requested a determination that their pre-petition claims against the Debtor, Nicholas Bayer ("N. Bayer"), are excepted from discharge under 11 U.S.C. §523(a). By order dated December 2, 2014 and entered on December 3, 2014, this court entered judgment against the Plaintiffs and in favor of N. Bayer. (Doc. # 73). The fourteen (14) day appeal period passed without an appeal. See Fed. R. Bankr. P. 8002(a)(1).

On January 6, 2015, the Plaintiffs filed a Motion for Extension of Time to File Notice of Appeal Pursuant to Rule 8002. (Doc. # 77) ("the Motion"). N. Bayer filed a response to the Motion on January 15, 2015. (Doc. # 80). The court held an evidentiary hearing on January 30, 2015. Post-trial submissions were completed on February 27, 2015.

-1-

For the reasons set forth below, I conclude that the Plaintiffs have not proven by a preponderance of the evidence that the missed appeal deadline was the product of "excusable neglect" as is their burden under Fed. R. Bankr. P.8002(d)(1)(B). Therefore, the Motion will be denied.

## II. FINDINGS OF FACT

At the January 30, 2015 hearing, three (3) witnesses testified: (1) Larson; (2) G. Bayer; and (3) Michael P. Gigliotti ("Gigliotti").[1]  In addition, three (3) exhibits were admitted into evidence.

Set forth below are my findings of fact based upon the testimonial and documentary evidence presented at the hearing.

1. The Plaintiffs commenced this adversary proceeding by filing a complaint on May 10, 2012. (Doc. # 1).

2. Gigliotti filed the complaint and, at that time, was Plaintiffs' sole counsel of record.

3. The adversary proceeding was tried in this court on December 12, 2013.  (Doc. # 50).

4. The Plaintiffs' lead counsel at trial was Robert D. Sweeney ("Sweeney"), an attorney practicing in Chicago, Illinois, who was permitted to appear in this adversary proceeding pro hac vice shortly before the trial was held.  (Doc. #'s 49, 56; N.T. at 37-38).

5. Once Sweeney entered his appearance, Gigliotti played only a limited role in the Plaintiffs'

---

[1]    The notes of testimony were transcribed, (see Doc. # 87) and will be referenced in this Opinion as "N.T."

representation, as local counsel and second chair at trial. (N.T. at 25).[2]

6.    Post-trial briefing in the adversary proceeding concluded on May 12, 2014. (Doc. # 71).

7.    The court's order granting judgment in favor of N. Bayer and against the Plaintiffs ("the

Judgment") was entered on the docket on December 5, 2014. (Doc. # 73).[3]

---

[2]    I recognize that at the outset of this proceeding, officially, Gigliotti was the Plaintiffs' sole counsel in this adversary proceeding. He drafted the initial complaint and amended complaint, as well as, presumably, some part of the parties' Joint Pre-Trial Statement. (See Doc. #'s 1, 15, 23). Also, prior to Sweeney's entry of appearance, Gigliotti participated in several pre-trial telephone conferences. However, too much should not be made of these activities. The pleadings were very short; they incorporated by reference and relied almost exclusively on a state court complaint, **authored by Sweeney** (the attorney who later entered his appearance and tried the case). (See Doc. # 15, Ex. A). The pre-trial conferences were not substantive in nature; they involved only procedural and scheduling issues. Neither side appeared to conduct any discovery, which is not surprising because the issues in this adversary proceeding have been the subject of other judicial proceedings, probably making it unnecessary for either party to seek discovery. As a result, from my observation of the pre-trial activity, I infer that Gigliotti did very little substantive work in this case before Sweeney entered his appearance and that the Plaintiffs never intended that Gigliotti would be lead counsel at trial. I also base these inferences on the fact that, initially, the parties were aware that I intended to consolidate this adversary proceeding for trial with a similar adversary proceeding filed by another creditor, Marshall J. Katz. (See Adv. No. 12-0393) Given Katz's prominent role in various litigation among the parties that has occurred in the bankruptcy court in this district, I strongly suspect that Larson and G. Bayer expected Katz and his counsel to take the laboring oar at the trial of this adversary proceeding. However, Katz settled his claim before trial. This left Larson and G. Bayer's claims to be tried on their own. Against this backdrop, they brought Sweeney in to try the case.

My conclusion, consistent with Gigliotti's testimony, is that once Sweeney came aboard, Sweeney was in charge of the representation and Gigliotti played only a limited role.

[3]    At some indeterminate time after final briefs were filed but before the entry of the Judgment, the following text message exchange occurred between Gigliotti and G. Bayer:

> Gigliotti:    I mean c'mon
> I'll be shocked if he rules against you in Nick's case.  If he does, I def suggest we take an appeal
>
> G.Bayer:    We would certainly do that.

(Ex. A). The text message exchange is undated and there was no testimony as to when it took place. But I infer from the circumstances it occurred after the briefing concluded and while the case was under advisement. I do not consider the pre-decision discussion regarding the filing of an appeal to be material
(continued...)

8.    Todd M. Mosser ("Mosser"), now present counsel, entered his appearance on the Plaintiffs'

behalf by filing the Motion on January 6, 2015.


\*    \*    \*    \*    \*    \*


9.    The Judgment was e-mailed to Gigliotti upon entry (Doc. # 73) and sent by first class mail

to Sweeney on December 5, 2014. (Doc. # 75).

10.    On December 4, 2014 at 8:57 a.m., Gigliotti forwarded to Larson a copy of the Judgment

and the accompanying Opinion by e-mail. (N.T. at 26; Ex. C).

11.    Later that day, at 6:24 p.m., Larson responded to Gigliotti by e-mail as follows:

> While Bob [Sweeney] is going over the opinion for the next few days, can you
> please locate the best appellate attorney or firm. I will be very thankful.

(Ex. C).[4]

12.    Gigliotti did not understand the e-mail to be an instruction that he file a notice of appeal; he

understood it be a request for a referral to another attorney to handle the appeal. (N.T. at 28,

31-32).

13.    After receiving Larson's e-mail, Gigliotti assumed that the Plaintiffs' decision regarding the

filing of an appeal would be made after consultation with Sweeney and that if they decided

to appeal, Sweeney would "reach out" to him for any assistance that he might need. (Id. at

---

[3](...continued)
in deciding whether a late-filed appeal should be permitted. But I include the text exchange to provide
some context to the more relevant events that occurred after the Judgment was entered.


[4]    In his testimony, Larson acknowledged that the reference to "Bob" was to Sweeney.

36).[5]

14. Thereafter, Gigliotti did not have any discussions with Sweeney regarding an appeal. (Id. at

35).

15. Gigliotti did not respond to Larson after receiving the December 4, 2014 e-mail.

16. Even though Larson received no response from Gigliotti to the December 4, 2014 e-mail,

Larson made no further attempt to reach Gigliotti thereafter. (Id. at 17, 19-20).[6]

17. Larson called G. Bayer and understood that G. Bayer was "trying to get a hold of" Gigliotti,

but the record does not reveal when that conversation occurred or its precise content. (Id. at

_____

[5]        Somewhat inconsistent with his testimony regarding his subservient position to Sweeney
in the representation, Gigliotti also testified that he did not respond to Larson's December 4, 2014 e-mail
because he understood his obligation to the Plaintiffs "was finished on sending them a copy of the
opinion when the case was over." (N.T. at 33).  More specifically, Gigliotti testified that his
understanding was that his agreement with the Plaintiffs provided for the payment of a "flat fee"
arrangement in return for representation solely as local counsel and that it did not encompass
representation in an appeal unless a separate retainer agreement was made. (Id. at 33-34).

        Notwithstanding the tension between Gigliotti's explanation that he understood Sweeney
to be the "captain of the ship" and his testimony that his representation had concluded once he gave the
Plaintiffs notice of the entry of the Judgment, I credit his testimony, and find it reasonable, that he
understood that any involvement he might have in filing an appeal would be initiated only by instructions
from Sweeney.  Gigliotti's perception is consistent with his limited role as local counsel during the course
of the entire adversary proceeding.  More significantly, Larson's December 4, 2014 e-mail strongly
implies that the decision to file an appeal would be made only after consultation with Sweeney.

        Had Sweeney instructed Gigliotti to file an appeal, would Gigliotti have declined to do so
in the absence of a new retainer agreement (and presumably, a new retainer fee)?  It is hard to say, in light
of his testimony.  However, the question is academic; Sweeney gave Gigliotti no such instruction.

[6]        Larson testified that he had no verbal communications with Gigliotti after that December
4, 2014 e-mail.  Had he made unsuccessful attempts to reach Gigliotti after December 4, 2014, I would
have expected him to volunteer some testimony on that point.  From the absence of such testimony, I infer
that there were no such attempts.

21).[7]

18. After December 4, 2014, Larson spoke with Sweeney, but the record does not reveal the content of the conversation(s). (See N.T. at 20).

\*    \*    \*    \*    \*    \*

19. G. Bayer also received notice of the court's ruling from Gigliotti during the morning of December 4, 2014. (N.T. at 10, 12-13).[8]

20. On December 4, 2014, he contacted Sweeney and requested that an appeal be filed. (N.T. at 11-13).

21. Sweeney did not file an appeal on behalf of G. Bayer. He advised G. Bayer to contact Gigliotti regarding the appeal.[9] (N.T. at 11).

22. Thereafter, at some point between December 4, 2014 and December 6, 2014, G. Bayer sent

---

[7]    Nor is there anything in the record to indicate that Larson followed up to ascertain the status of G. Bayer's efforts to communicate with Gigliotti.

[8]    G. Bayer acknowledged that Gigliotti advised him of the entry of Judgment, but there is no specific indication in the record as to when that occurred. In light of the fact that G. Bayer reached out to Sweeney on December 4th, (see Finding of Fact No. 20, infra), it is clear that Gigliotti advised him of the Judgment on December 4th.

[9]    Sweeney's instruction to G. Bayer to contact Gigliotti is somewhat inconsistent with Gigliotti's characterization of his role in this proceeding in that it suggests that Gigliotti would take instruction directly from the Plaintiffs rather than from Sweeney. There was no testimony from Sweeney that might have clarified the relationship and dynamics among the Plaintiffs, Gigliotti and Sweeney during the relevant time period.

a text to Gigliotti which stated: "We need to file appeal. What is the date?" (Ex. B).[10]

23. On Saturday, December 6, 2014, at 5:29 p.m., G. Bayer again texted Gigliotti: Please call

me[.] How much time do we have[?]" (Id.).

24. On Monday, December 8, 2014, G. Bayer again texted Gigliotti: "Call me or text[.] Need to

know About case[.]" (Id.).

25. Gigliotti did not respond to any of G. Bayer's text messages. (N.T. at 9).[11]

26. After December 8, 2014, G. Bayer made no further attempt to communicate with Gigliotti.

(Id.).

27. At some indeterminate point in time prior to the filing of the Motion, G. Bayer "reached

out" and contacted present counsel, Mosser. (N.T. at 23).


*       *       *       *       *       *


28. At no time did Gigliotti advise either Plaintiff of the deadline for filing an appeal. (N.T. at

10).

29. Gigliotti's only verbal discussions with either Plaintiff regarding the filing of an appeal

occurred in the summer of 2014, prior to the court's issuance of the Judgment. (Id. at 30).

30. That discussion involved "their right to appeal," but "not specifically [Gigliotti] doing it [or]

what the fee arrangement would be." (Id. at 31).

---

[10]    The text in Ex. B is undated. I infer that G. Bayer sent it after speaking with Sweeney,
but before the December 6, 2014 text referenced in Finding of Fact No. 21.


[11]    Gigliotti denied receiving the text messages from G. Bayer. (N.T. at 29). The Plaintiffs
request that I disbelieve his testimony as incredible. (Pls.' Mem. at 2 n.2) (Doc. # 85).  For the reasons
discussed in n.20, infra, I find it unnecessary to make any findings on the issue.

### III.  APPLICABLE LEGAL PRINCIPLES UNDER RULE 8002(d)(2)

#### A.

Fed. R. Bankr. P. 8002(a) provides that, subject to certain exceptions not applicable here, a notice of appeal must be filed with the bankruptcy clerk within fourteen (14) days after the entry of judgment.

Rule 8002(d) provides for an extension of the fourteen (14) day appeal period as follows:

> (1)  When the Time May be Extended.  Except as provided in subdivision (d)(2), **the bankruptcy court may extend the time to file a notice of appeal** upon a party's motion that is filed:
>
>> (A)    within the time prescribed by this rule; or
>>
>> (B)    **within 21 days after that time, if the party shows excusable neglect**.
>
> .  .  .
>
> (3)  Time Limits on an Extension. No extension of time may exceed 21 days after the time prescribed by this rule, or 14 days after the order granting the motion to extend time is entered, whichever is later.[12]

Fed. R. Bankr. P. 8002 (emphasis added).

In this adversary proceeding, the appeal period deadline was December 17, 2014, fourteen (14) days after the entry of the Judgment on December 3, 2014.  The Plaintiffs filed the Motion on January 6, 2015, twenty (20) days after the "time prescribed" in Rule 8002 for filing a

---

[12]    Rule 8002(d)(2) sets forth certain exceptions to subsection (d)(1).  None are applicable in this adversary proceeding.

notice of appeal.  Consequently, the motion was timely as it was filed within the requisite twenty-one (21) time period in Rule 8002(d)(1)(B).

Under Rule 8002(d)(1)(B), the Plaintiffs carry the burden of proving that the failure to file a timely appeal was the product of "excusable neglect." See, e.g., In re Boyce, 2009 WL 4060093, at *1 (Bankr. E.D. Pa. Nov. 18, 2009); accord In re AMF Bowling Worldwide, Inc., 520 B.R. 185, 196 (Bankr. E.D. Va. 2014).

The term "excusable neglect" in Rule 8002 also is found in Fed. R. Bankr. P. 9006(b)(1), Fed. R. Bankr. P. 60(b) and Fed. R.A. P. 4(a)(5)(ii).  The Supreme Court definitively construed Rule 9006(b)(1) in Pioneer Inv. Servs. Co. v. Brunswick Associates Ltd. P'ship, 507 U.S. 380 (1993).[13]  Pioneer informs the application of excusable neglect in every court rule in which that term is used.  In this Circuit, the Court of Appeals specifically has held that the Pioneer standard for Rule 9006(b)(1) is used in applying Rule 8002(d)(1)(B).  See American Classic Voyages, 405 F.3d 127, 133 (3d Cir. 2005); In re Kaplan, 482 F. App'x 704, 707 (3d Cir. 2012) (nonprecedential); In re Lashinger, 1999 WL 409389, at *2 (Bankr. E.D. Pa. June 15, 1999).

## B.

In Pioneer, the Supreme Court stated that

> by empowering the courts to accept late filings "where the failure to act was the result of excusable neglect," Rule 9006(b)(1), Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control.

---

[13]    The term "excusable neglect" also is found in F.R.A.P. 4(a)(5).

507 U.S. at 392 (footnote omitted).  In short, "excusable neglect is a somewhat "elastic concept"

that is "not limited strictly to omissions caused by circumstances beyond the control of the

movant." Id. at 392.[14]  Rather, it applies to "situations where the court, after weighing the

relevant considerations is satisfied that counsel has exhibited substantial diligence, professional

competence and has acted in good faith to conform his or her conduct in accordance with the

rule, but as the result of some minor neglect, compliance was not achieved." Kanoff v. Better

Life Renting Corp., 350 F. App'x 655, 657 (3d Cir. Oct. 28, 2009) (nonprecedential) (internal

quotations omitted) (quoting Consolidated Freightways Corp. of Delaware v. Larson, 827 F.2d

916, 920 (3d Cir. 1987)).

　　　　The Court further advised, in Pioneer, that the excusable neglect "determination is at

bottom an equitable one, taking account of all relevant circumstances surrounding the party's

omission." Id. at 395.  The Court provided some guidance for this equitable determination by

stating that the circumstances to be considered  include:

　　　　　　1.　the danger of prejudice to the debtor (non-moving party);

　　　　　　2.　the length of delay and its potential impact on judicial proceedings;

　　　　　　3.　the reason for the delay, including whether it was within the reasonable
　　　　　　　　control of the movant; and

---

[14]　　　As one bankruptcy court observed:

　　　　　　the notion of "excusable neglect" of necessity presumes that someone has made a
　　　　　　mistake, someone has been careless, someone has been negligent. It is no answer,
　　　　　　then, to a request for mercy that the party making the request should not have
　　　　　　made the mistake. Hindsight always affords the clarity that [confirms] that, had
　　　　　　the person simply been paying strict attention, no mistake would have been
　　　　　　made.

In re Harnett, 2012 WL 162558, at *2 (Bankr. W.D. Tex. Jan. 19, 2012).

4.    whether the movant acted in good faith.

Id.[15]

A court must consider and balance all of four Pioneer factors and no one factor is

determinative.    American Classic Voyages, 405 F.3d. at 133.    That said, courts "often focus on

the third factor, and the equities will rarely if ever favor a party who fails to follow the clear

dictates of a court rule."    Kaplan, 482 F. App'x at 706 (quotations omitted); see also In re

Woskob, 96 F. App'x 794, 795 (3d Cir. 2004) (nonprecedential) (affirmance of district court

determination that excusable neglect not established where the appellant "satisfied three of the

Pioneer factors, but [not] the fourth factor, the reason for the delay in filing the notice of

appeal"); Lowry v. McDonnel Douglas Corp., 211 F.3d 457, 463 (8th Cir. 2000) (the excuse

given for the late filing "must have the greatest import").

_____

[15]    In this Circuit, the Court of Appeals has directed that Pioneer be applied with reference to
the set of considerations articulated in the pre-Pioneer case, Consolidated Freightways:

> (1) whether the inadvertence reflects professional incompetence such as
> ignorance of the rules of procedure;
>
> (2) whether the asserted inadvertence reflects an easily manufactured excuse
> incapable of verification by the court;
>
> (3) whether the tardiness results from counsel's failure to provide for a readily
> foreseeable consequence;
>
> (4) whether the inadvertence reflects a complete lack of diligence; or
>
> (5) whether the court is satisfied that the inadvertence resulted despite counsel's
> substantial good faith efforts toward compliance.

Ragguette v. Premier Wines & Spirits, 691 F.3d 315, 325-26 (3d Cir. 2012).

I understand the Court of Appeals' instruction to be that courts should consider the
Consolidated Freightways factors, (to the extent relevant in a particular case), in evaluating the third
prong of Pioneer, (i.e., the reason for the delay, including whether it was within the reasonable control of
the movant).

-11-

Finally, and especially pertinent in this adversary proceeding, the excusable neglect

inquiry focuses on the conduct of the attorney who failed to act timely on behalf of his or her

client. This is so because parties are bound by the acts and omissions of their attorneys. See

Pioneer, 507 U.S. at 396 ("clients must be held accountable for the acts and omissions of their

attorneys"). The Pioneer analysis "does not focus on whether the clients "did all they reasonably

could in policing the conduct of their attorney," but "whether the neglect of [the clients] *and*

*their counsel* was excusable." In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine)

Products Liability Litigation, 92 F. App'x 890, 893 (3d Cir. Mar. 12, 2004) (nonprecedential)

(emphasis in original) (quoting Pioneer, 507 U.S. at 396-97).


## IV.  DISCUSSION

### A.

Three (3) of the four (4) Pioneer factors favor allowance of late-filed notice of appeal as

the Plaintiffs request.

First, there is no material prejudice to N. Bayer if the late appeal were permitted to

proceed. If the motion were granted, the most significant consequence would be his loss of "the

windfall benefit of an opponent's missed deadline." Pincay v. Andrews, 351 F.3d 947, 954 (9th

Cir. 2003); see also Kohl's Dept. Stores, Inc. v. Levco-Route 46 Assocs., L.P., 121 F. App'x.

971, 975 (3d Cir. 2005) (nonprecedential).

This is not to say that there is no prejudice. The resumption of the Plaintiffs'

nondischargeability litigation undoubtedly impinges on the finality of the fresh start N. Bayer

seeks through his chapter 7 discharge. However, the impact on him is only a matter of degree.

This adversary proceeding already has been pending for several years since the entry of N. Bayer's discharge. Trial of the proceeding was delayed for a number of months to permit the Katz settlement discussions (which involved a global settlement affecting parties in another bankruptcy case and were complicated) to play themselves out – ultimately to N. Bayer's benefit. He raised no objection to those delays. Nor does N. Bayer have any legally cognizable expectation that this court's ruling in his favor would be final with no possibility of appeal. He has offered no evidence or argument that he relied in any way on the expiration of the appeal deadline. Therefore, there is no prejudice to him that should weigh against granting the Motion.

The second factor also favors the Plaintiffs. The delay was not substantial. The Motion was filed within twenty (21) days of the passage of the appeal deadline. Rule 8002(d)(1)(B) strongly suggests that the Motion was timely and there is nothing in the record to suggest that permitting the appeal to proceed will disrupt any ongoing legal proceedings. Indeed, this adversary proceeding appears to be the last "moving part" in N. Bayer's bankruptcy case.

Third, there is nothing in the record that causes me to believe that the Plaintiffs are not acting in good faith. For more than (5) years, in the chapter 11 case of Saxby's Coffee Worldwide, LLC, Bky. No. 09-0340 as well as in the three (3) individual bankruptcy cases of its principals, the Plaintiffs have doggedly maintained that they were wronged by N. Bayer and by the asset sale transaction that underlies their claim against him. I have no reason to doubt the sincerity of their desire to seek review of the adverse decision they received from this court on the merits of their nondischargeability claim against N. Bayer. Nor are the grounds for the appeal frivolous. In the Opinion accompanying the entry of Judgment, I determined that the claim was without merit because N. Bayer was not acting in a fiduciary capacity within the

meaning of 11 U.S.C. §523(a)(4).  However, I acknowledged that there is legal support for the

Plaintiffs' contrary position.  See In re Bayer, 521 B.R. 491, 509-13 (Bankr. E.D. Pa. 2014).

But there is more to consider before granting the requested extension.  Like many

"excusable neglect" cases, the request made in the Motion founders on the final Pioneer factor.

As explained below, the reasons for the Plaintiffs' delay are so insubstantial that, in the exercise

of my discretion, I conclude that this factor outweighs the other considerations.


## B.

The prototypical "excusable neglect" case involves an attorney's failure to make a timely

filing due to some type of confusion, mix-up, error or external event that interfered with his or

her ordinary diligence in satisfying the time deadlines that arise in litigation.  This is not such a

case.  Gigliotti did not miss the appeal deadline due to some inadvertent error.  He made a

conscious choice to take no action.  As a result, the Plaintiffs attack the issue from a different

direction.  The main thrust of their argument is they were "abandoned" by their attorney,

Gigliotti, and that they themselves were diligent in their efforts to pursue an appeal.

This somewhat unusual approach to excusable neglect skews the analysis.  For example, it

is difficult to conceptualize how one evaluates the third Pioneer factor (or applies the

Consolidated Freightways factors, see n.15, supra), in a case in which the missed deadline was

not the product of an unintended error.  In any event, as explained below, the Plaintiffs have

failed to carry their burden of proof on the issue under either a "traditional" excusable neglect

analysis or under the singular theories that they have advanced.

**1.**

The first step in evaluating a claim of excusable neglect is to determine whether the failure to act timely was the product of "neglect;" only then does the court consider whether the neglect was "excusable." Sonders v. Mezvinsky, 2001 WL 1403525, at *3 (Bankr. E.D. Pa. Oct. 5, 2001). If the missed deadline was the product of an attorney's conscious decision, no extension may be granted Rule 8002(d)(1)(B). See, e.g., Brodie v. Gloucester Twp., 531 F. App'x 234, 237 (3d Cir. 2013) (nonprecedential); Lee v. Toyota Motor Sales, U.S.A., Inc., 1997 WL 256976, at *3 (E.D. Pa. May 16, 1997).

In this proceeding, the record establishes that the Plaintiffs did not miss the appeal deadline because of their attorneys' "neglect." G. Bayer initially contacted Sweeney regarding an appeal. Sweeney sought to pass the obligation to file the notice of appeal on to Gigliotti without communicating that to him (leaving that task to his client), and at no time did he follow up with Gigliotti. Gigliotti did not to file a notice of appeal because he received no instructions from Sweeney to do so. Gigliotti believed that his role as local counsel was to defer to Sweeney and that any obligation he might have had to file a notice of appeal as local counsel would arise only after the Plaintiffs consulted with Sweeney and Sweeney communicated the requisite instruction. But Sweeney never did so.

Critically, there is nothing in the record explaining why Sweeney never contacted Gigliotti to instruct him to appeal, or why the Plaintiffs did not return to Sweeney for additional help once they found Gigliotti unresponsive or why Sweeney thereafter did not reach out to Gigliotti to request that he file the notice of appeal. Thus, there is no basis to conclude that the absence of a communication from Sweeney to Gigliotti was due to some kind of mix-up or

inadvertence that might be excusable. One can only speculate why no one did anything after G.

Bayer sent the final text message to Gigliotti on December 8, 2014, nine (9) days before the

appeal deadline. But, I am not free to speculate. It was the Plaintiffs' burden to generate a

record with a coherent and complete explanation of the circumstances which caused them to

miss the appeal deadline. In the absence of any information regarding what occurred after

December 8, 2014, the only certainty is that Gigliotti did not file the notice of appeal as a result

of a deliberate choice.

　　　Whether Gigliotti's decision or his reasoning coming to that decision was reasonable or

unreasonable, correct or incorrect, competent or negligent, consistent or inconsistent with his

obligations under the Rules of Professional Conduct is beside the point. Because he made a

conscious choice not to file a notice of appeal, there can be no excusable neglect. See Broadcast

Music, Inc. v. Crocodile Rock Corp., 2014 WL 3953182, at *2 (E.D. Pa. Aug. 12, 2014)

("excusable neglect" must be distinguished from "professional neglect"); McGee v. United

States, 2015 WL 1090300, at *2 (S.D. Ill. Mar. 10, 2015) ("a [lawyer's] deliberate and

purposeful decision not to pursue an appeal is not neglect at all"); Baker v. Douglas, 2010 WL

4386476, at *4 (M.D. Pa. Oct. 29, 2010) (excusable neglect cannot be based on ignorance of the

law); In re Steve A. Clapper & Associates of Florida, 346 B.R. 882, 886 (Bankr. M.D. Fla. 2006)

("[m]isunderstanding of the rules governing appeals . . . does not constitute 'excusable

neglect.'").

　　　Perhaps the Plaintiffs could have made out a case of excusable neglect had they offered

some evidence that some snafu kept Sweeney from reaching Gigliotti to permit the notice of

appeal to be filed timely. They did not do so. As suggested above, it is both conspicuous and

-16-

most telling that there is virtually nothing in the record regarding Sweeney's role in the Plaintiffs' representation after the entry of the Judgment. Did Larson ever speak with Sweeney after he sent Gigliotti the December 4, 2014 e-mail?[16] Did Sweeney and Plaintiffs jointly decide that an appeal was appropriate? Did Sweeney do anything at all during the appeal period? Why didn't he contact Gigliotti? The Plaintiffs have addressed none of these questions. Their silence is deafening. Given Gigliotti's subservient position in the representation and Sweeney's role as lead counsel, information regarding all of these questions is essential to an equitable evaluation of the circumstances that led to the missed appeal deadline.

Simply put, the Plaintiffs failed to create a record that gave due consideration to Sweeney's critical role in the post-Judgment decision making process. Without knowing more about what actions the Plaintiffs took and what actions Sweeney took (or did not take), the Plaintiffs simply have not satisfied their burden of proof on the issue of excusable neglect. The fact that Gigliotti may (or may not have) fallen short in fulfilling his duties as counsel to the Plaintiffs, does not shore up this cavernous gap in the record.

### 2.

The Plaintiffs nonetheless contend that excusable neglect exists by depicting this as "an extraordinary case where Plaintiffs were left completely in the dark about their appellate rights [because Gigliotti failed to advise them of the fourteen (14) day appeal deadline] and were abandoned by their counsel. (Pls.' Mem. at 7) (Doc. # 85). They suggest that they should not be

---

[16]     To be clear, I flatly reject Larson's testimony that the December 4, 2014 e-mail instructed Gigliotti to file a notice of appeal. The e-mail requested only a referral to an appellate attorney and strongly implied that Larson would continue to rely on Sweeney as his lead attorney in this proceeding.

bound Gigliotti's deliberate decision not to file a notice of appeal, arguing that "the Third Circuit has rejected the unforgiving rationale that a client [always] be penalized by his lawyer's malfeasance." (Id.).

I am unpersuaded by this argument because it is not supported by the record as a factual matter.

Even if Gigliotti did not fulfill his professional obligations to them, Larson and G. Bayer were hardly prototypical helpless, "abandoned" clients. They were not wholly dependent on Gigliotti, who was merely their local counsel. Sweeney was their chief counsel and advisor and they have not demonstrated that he, too, abandoned them.[17]

Consequently, I conclude that even accepting that there are rare cases in which a court may relax the general rule that parties are bound by the actions of their counsel, there is nothing extraordinary about the Plaintiffs' situation that warrants application of any exception to this well established rule – a rule that serves as one of the foundations of our judicial system. In short, the same shortcoming in the evidentiary record (i.e., the absence of any explanation of Sweeney's actions or inaction in the relevant time period) that defeats any argument that the missed appeal deadline was the product of the excusable inadvertence of the Plaintiffs' **two** (2) attorneys, also precludes any finding that the Plaintiffs were abandoned clients who merit extraordinary dispensation from the rules of court.

---

[17]     This point also largely undercuts the Plaintiffs' emphasis on the undisputed fact that Gigliotti did not advise them that there is a fourteen (14) day appeal period. Sweeney, too, is held to the knowledge of the court rules, including the deadline for filing a notice of appeal.

-18-

**3.**

I also observe that the legal authorities the Plaintiffs cite in support of their argument are easily distinguished.

They cite <u>Seitzinger v. Reading Hosp. & Med. Ctr.</u>, 165 F.3d 240 (3d Cir. 1999) as a case in which the Court of Appeals "rejected the unforgiving rationale that a client must be penalized by his lawyer's malfeasance." (Pls.' Mem. at 7) (Doc. # 85).   However, the facts in <u>Seitzinger</u> are far more egregious than those in this adversary proceeding.  The issue in <u>Seitzinger</u> was whether a plaintiff had filed an employment discrimination case within ninety (90) days of receiving a right-to-sue letter from the EEOC, as required by 42 U.S.C. § 2000e–5(f)(1).  The plaintiff filed the action two (2) days after the ninety (90) day deadline.  The Court of Appeals found that the computation of the filing deadline should be equitably tolled because the plaintiff's "misbehavior went well beyond the garden variety." 265 F.3d at 241.  The attorney "affirmatively lied" to the plaintiff, assuring her that the complaint had been filed and that those "affirmative misrepresentations" exceeded the level of "garden variety neglect," thus warranting invocation of the equitable tolling doctrine.  (<u>Id.</u>).  Nothing in the record in this adversary proceeding suggests that Gigliotti misled the Plaintiffs in any similar manner.

<u>Boughner v. Sec'y of Health, Ed. And Welfare</u>, 572 F.2d 976 (3d Cir. 1978) also is distinguishable.  In <u>Boughner</u>, the Court of Appeals reversed the district court denial of relief under Fed. R. Bankr. P. 60(b) from a judgment arising from the defendant's  unopposed motion for summary judgment because it found the plaintiff's attorney's inaction the product of "neglect so gross that it is inexcusable." 572 F.2d at 978.  The court determined that the case before it was only one (1) of fifty-two (52) cases involving similar claims under the Federal Coal Mine

Health and Safety Act of 1969, 30 U.S.C. §§901 et seq. in which the plaintiff's attorney failed to respond to motions for summary judgment filed by the United States. The court found the circumstances "sufficiently exceptional and extraordinary so as to mandate relief" under Rule 60(b) notwithstanding the general rule that a client is bound by the actions of his or her attorney. 572 F.2d at 978. Nothing in this adversary proceeding rises anywhere near the level of neglect and misconduct that occurred in Boughner.

The third case Plaintiffs cite is Lauro v. Shearer, 2007 WL 4180683 (W.D. Pa. Nov. 20, 2007), offered for the proposition that the Pioneer excusable neglect standard is satisfied if the attorney fails to advise the party of the appeal deadline and does not respond to the party's inquiries. Lauro was a case in which the bankruptcy court closed a chapter 7 case without a discharge because the debtors failed to file timely the required certificate of completion of a post-petition course concerning personal financial management. See 11 U.S.C. §727(a)(11). Their counsel had not advised them of the deadline for doing so. The bankruptcy court refused to reopen the case to permit the debtors to file the certificate and obtain their chapter 7 discharge. The district court reversed the bankruptcy court order, pointing out that the bankruptcy court had not undertaken the mandatory evaluation of the four (4) Pioneer factors, but rather than remand, the court reversed the denial of relief outright. Lauro is not entirely on point because it was not a case in which the omission was entirely that of the attorney. Satisfaction of the filing deadline required actions by the debtors: completion of the financial management course. While the attorney may not have advised the debtors of the filing deadline, the debtors independently believed that they had six (6) months, not just forty-five (45) days to fulfill their responsibilities. In the end, Lauro is less a case of attorney error, and more one in which the other Pioneer factors

-20-

were so compelling that the court found it equitable to permit the debtors to file a tardy

certificate of completion of financial management counseling so that they could receive the

bankruptcy discharge to which they were otherwise entitled.

## 4.

Finally, even if the Plaintiffs had established that this is the rare case that might support

the conclusion that they should not be bound by their attorneys' actions or inaction, they

recognize that the court's equitable determination requires consideration whether they were

diligent.[18] They contend that they were "diligent in their efforts to secure an appeal," (Pls.'

Mem. at 8) (Doc. # 85), only to be stymied by Gigliotti. Respectfully, I disagree that they made

such a showing.

I fail to see any credible argument that Larson acted in a diligent manner. He sent one

(1) e-mail to Gigliotti that stated only that he was looking for another attorney to handle the

appeal and suggested that he would be consulting with Sweeney. He never made any further

effort to contact Gigliotti. At most, he relied on his "understanding" that G. Bayer was

following up on trying to reach Gigliotti. This does not paint a picture of diligence. I conclude

that Larson was not diligent.

G. Bayer's situation is a closer call, however. He sent three (3) text messages, between

December 4 and 8, 2014, one of which used the phrase "need to appeal" and inquired as to the

filing deadline. The other two (2) texts asked Gigliotti to call or text him back. The second of

those two texts possibly reflected some sense of urgency: "Need to know about the case."

---

[18]    The Court of Appeals in Seitzinger analyzed the plaintiff's conduct for diligence before
applying the doctrine of equitable tolling. 165 F.3d at 241.

Certainly, G. Bayer did more than Larson. But, he failed to develop an adequate record regarding his efforts to appeal the Judgment. If he was anxious to appeal and already was concerned about the appeal deadline, as one might infer from his three (3) texts sent within four (4) days of learning of the adverse Judgment, why did he take no further action after December 8th? After Gigliotti did not respond, why didn't he telephone Gigliotti? Was he in touch with Larson concerning the appeal and the need to mobilize Gigliotti into action, as Larson suggests? If so, what explains his lack of further action after December 8th? There are too many unanswered questions. Consequently, I conclude that G. Bayer did not meet his burden of demonstrating his diligence.[19]

## V. CONCLUSION

For the reasons set forth above, I conclude that the Plaintiffs have not met their burden of establishing that the missed appeal deadline occurred due to "excusable neglect," as required by Fed. R. Bankr. P. 8002(d)(1)(B). Consequently, the Motion will be denied. An appropriate order follows.

---

[19]    As stated in n.11, supra, Gigliotti denied receiving G. Bayer's texts and the Plaintiffs request that I disbelieve his testimony as incredible. The record consists of a document that supports G. Bayer's contention that he sent the texts and Gigliotti's denial that he received them. I suspect that relatively objective evidence was available (from the communications service providers) that may well have resolved this fact issue. But no such evidence was offered by the parties.

In any event, I find it unnecessary to decide whether Gigliotti received the texts. If Gigliotti received them, that is all the more reason why his inaction was a conscious choice and not the product of excusable neglect. Alternatively, if Gigliotti did not receive the texts, a technological failure that arguably could support a finding of excusable neglect, see Sonders, 2001 WL 1403525, at *5-6, the Plaintiffs failed to demonstrate their diligence thereafter in protecting their appellate rights, making the missed deadline unavoidable. Either way, there is no excusable neglect.

Date: **March 23, 2015**

_____
**ERIC L. FRANK**
**CHIEF U.S. BANKRUPTCY JUDGE**